HARVEY BUNCE, Administrator of PRESTON BECK, Defendant in Error, *v.* JAMES P. BECK, Executor of PRESTON BECK, Jr., Plaintiff in Error.

1. *Evidence — Contract — Parol agreement.*— It is a general rule that extrinsic evidence cannot be admitted to contradict, add to, subtract from, or vary, a written contract. Parties may, by a subsequent parol agreement, upon a sufficient consideration, change the mode of payment or other terms of their written contract, or they may discard it altogether; and it makes no difference how soon after the execution of the written contract the parol one was made, if, in fact, it was subsequent, and not otherwise objectionable. But (where the written agreement was neither incomplete nor uncertain in its terms) the parol contract, to be admissible, must be independent, and not explanatory or contradictory, of the written one.

*Appeal from Third District Court.*

The letter given by Mrs. Beck to Bunce, administrator, referred to in the opinion of the court, is as follows:

"*28th June*, 1865.— SIR: Mrs. Juliet A. Beck and myself have settled our law suit, by her allowing me the sum of two-thirds, and one-ninth of the remaining third, of the estate of Preston Beck, Jr., deceased, as claimed by me before the Probate Court of Cooper county. You will please deliver to Mrs. Beck all her equitable rights and assets in your hands, after deducting the said two-thirds, and one-ninth of remaining one-third, just expenses, costs, fees, etc., when she dismisses her suit. You are, I understand, prosecuting the said Juliet A. Beck and her securities, Mr. William Limerick. You will please not prosecute them for money included and allowed them in this settlement of two-thirds, and one-ninth of the remaining one-third, to me as aforesaid, and dismiss any suit you may have against the parties for the sum I allowed them in our settlement; *i. e.*, two-thirds, and one-ninth of the remaining one-third, of P. Beck Jr.'s estate is allowed to me, and their portion of the remaining one-third to them; and you will please deliver to Juliet Beck any papers, notes, or documents of said J. A. B. and William Limerick, that will not infringe my two-thirds, and one-ninth of the remaining third, of P. Beck Jr.'s estate, as adjudged by the Probate Court of Cooper county, Missouri.

"Respectfully,　　　　　　　　　J. P. BECK."

The portion of the deposition of Mrs. Beck touching the meaning of this letter was as follows :

Question 22.—" After you had received the letter addressed to Harvey Bunce, and before you had delivered the same to Mr. Bunce, did you have one or more conversations with James P. Beck concerning said letter and its true meaning? and if so, state what James P. Beck said was the true meaning of said letter, and in regard to said compromise."

Answer.—" After I had received the letter referred to, and before I had delivered the same to Mr. Bunce, I had two or three conversations with James P. Beck about said letter, its meaning, etc., and asked him, James P. Beck, to explain it so that it could be understood. James P. Beck said that it was plain ; that Mr. Bunce was a man of sense, and would understand it, and would give me up the note on that letter, and that was all I wanted ; that if Bunce did not do this he would have no sense. He also stated that I should have no more trouble about said note ; that there would be still more coming to the children (referring to my children). He also said he would not compromise with the other heirs upon as favorable terms as he had compromised with me."

The objection to this question and answer was overruled, and exceptions taken.

Question 23.—" In these conversations, did James P. Beck tell you what he intended said letter to Mr. Bunce to mean ; and if so, what was the meaning he gave to said letter ? "

Answer.—" He did ; and assured me repeatedly that Mr. Bunce would give me up my note on that letter."

Question 29.—" State why you made the compromise with Dr. J. P. Beck on the terms stated ? "

Answer.—" I was induced to make said compromise with said Dr. James P. Beck in order to relieve my securities, who were annoyed by the suit on the note in the Lafayette Circuit Court ; and, to rid them and myself of this annoyance, I made said compromise."

The following is a portion of Limerick's deposition touching the same :

Question 6.—" State, as fully as you can recollect, what passed

between you and Juliet A. Beck, Dr. James P. Beck, about said letter to said Bunce, and its construction, and if Dr. Beck gave his meaning to or construction of said letter before it was presented to said Bunce. State what his (Dr. Beck's) construction was."

Answer.—" Mrs. Beck came to me in the city of St. Louis, one afternoon, and told me she had an appointment to meet Dr. James P. Beck at his house, at four o'clock on said afternoon, early in July last, for the purpose of settling all matters of dispute between them, and requested me to accompany her to Dr. Beck's house. That meeting lasted from four o'clock in the afternoon until midnight. At that meeting, this agreement, heretofore referred to, and stated in my answer to the fourth inquiry" (already copied in substance), " was made between J. A. Beck and Dr. James P. Beck. After the agreement was made, most of the time consumed at said meeting was occupied by Dr. James P. Beck in writing an article of agreement between himself and Mrs. Beck, and a letter of instruction to Mr. Bunce, administrator as aforesaid. On reading the letter he had written to Mr. Bunce, as far as he had then written it, I thought it was not satisfactory, and told Dr. Beck, as far as he had then written said letter, he had said nothing about the dismissal of said suit on said $30,000 note in Lafayette county, and the delivery of said note to Mrs. Beck. He then added to the letter what is written in said letter in relation to the giving up of said note to Mrs. Beck, and the dismissal of said suit thereon. At that time (the time of said writing) we had considerable conversation about the ambiguity and circumlocution of said letter, and I requested Dr. Beck to permit me to write a direct order to Mr. Bunce, directing him to dismiss said suit on said note, and to give up said note to Mrs. Beck, which he (Dr. Beck) refused to do, saying that Mr. Bunce, on that letter which he (Dr. B.) had written, would not refuse to give up said note and dismiss said suit; and that if the said Bunce so refused to do, that he (Dr. B.) would go himself to Boonville and have the business settled as understood between himself and Mrs. Beck; and Dr. B. repeatedly made use of such utterances as the one last above mentioned."

The questions and answers objected to in Silver's deposition

Bunce, Adm'r of Beck, v. Beck, Ex'r of Beck, Jr.

are of the same character with those referred to in Mrs. Beck's and Limerick's, and need not, therefore, be particularly stated.

*W. B. Napton,* for appellant.

The parol evidence allowed in this case — to contradict the written contracts and orders, to establish that Beck meant, and declared that he meant, the very reverse of what he wrote — was improperly allowed. (Greenl. Ev. ch. 15.) The general rule undoubtedly is that all previous and cotemporary conversations are merged in the written contract. (1 Greenl. Ev. § 281; Gooch v. Conner, 8 Mo. 391; Gregory v. Cowgill, 19 Mo. 416; Rollin v. Claybrook, 22 Mo. 406; Cawthorn v. Haynes, 24 Mo. 236; Bradley v. Bradley, 24 Mo. 315; Smith v. Thomas, 29 Mo. 310.)

To ascertain, however, what meaning the parties intend to convey by the words they use in a written instrument, parol evidence of extraneous facts and circumstances may be admitted to a very great extent without infringing the general rule; and Mr. Greenleaf has furnished us with a very full and exact detail of all the classes of cases in which this is permitted. Let us see if the present can be brought, by any sort of ingenuity, within any of these classes.

1. " All cotemporaneous writings relating to the same subject matter are admissible." This principle we adopt and use in our evidence, and the court will see that it utterly destroys the theory of the opposite party.

2. Fraud, illegality, want of consideration, duress, infancy, imbecility, etc., may be proved to avoid a written contract. There is no pretense in this case of any of these things. They propose not to avoid the contract, but to change it.

3. Where the original contract is verbal, and only part of it is reduced to writing, the remainder may be supplied by parol. Nothing of this is pretended here.

4. Recitals of facts may be contradicted to show that the consideration money was more than stated in the deeds. This has no bearing on our case.

5. Parol evidence may be given explanatory of the nature and qualities of the subject to which the instrument refers; as where

18—VOL. XLIII.

a factory is conveyed, it may be shown what this embraced and included. Courts may put themselves in the place of the party; *i. e.*, ascertain his relations and surroundings, in order better to understand what he meant. But no case can be shown, nor has any been cited by Greenleaf under this head, where proof is admissible to show that a party declares his meaning to be other than that contained in the instrument itself. Yet this is the very thing which all the plaintiff's evidence is intended to show. All the proof introduced is to show that Beck meant so and so; that he said his letter to Bunce meant so and so; that the paper would accomplish such and such results.

This point is fully discussed and decided by Lord Abinger in Hiscocks v. Hiscocks, 6 Mees & W. 363. There was in that case an attempt, not, as here, to explain the words or meaning of the paper (which, it seems, would have admitted of no doubt), "but to supply some deficiency, or remove some obscurity, or to give effect to expressions that were unmeaning or ambiguous." Now, this is the plausible pretext assumed in this case, and let us see what Lord Abinger said on this point. "There is," he observes, "but one case in which it appears to us that this sort of evidence of intention can properly be admitted, and that is where the meaning of the testator's words is neither ambiguous nor obscure, and where the devise is, on the face of it, perfect and intelligible, but, from some of the circumstances admitted in proof, an ambiguity arises as to which of the two or more things, or which of the two or more persons, each answering the words in the will, the testator intended to express. Thus, if a testator devise his manor of S. to A. B., and has two manors, of north S. and south S., it being clear that he means to devise one only, whereas both are equally denoted by the words he has used, in that case there is what Lord Bacon calls an ' equivocation'— that is, the words apply equally to either manor; and evidence of previous intention may be received to solve this latent ambiguity, for the intention shows what he meant to do; and when you know that, you immediately perceive that he has done it by the general words he has used, which, in their ordinary sense, may properly bear that construction. It appears to us that, in all other cases,

parol evidence of what was the testator's intention ought to be excluded, upon this plain ground — that his will ought to be made in writing," etc.

6. This exception relates to usage, etc., which does not concern us in this case.

7. Parol evidence is allowed to rebut an equity, and this topic is also foreign to this case.

8. Mistake and fraud may let in parol evidence.

Now, the parol evidence in this case does not fall within any of the exceptions referred to by Mr. Greenleaf, and is directly opposed to the general rule, as will be seen by reference to section 281 and the authorities cited in support of it, and section 360 in part VI, and sections 363 and 366. In this last section it is distinctly stated that parol evidence is never admitted to prove that a party did not mean what he says.

*R. M. Field*, for appellant.

It is an established rule of law that oral testimony is not admissible to vary or explain written instruments. This rule is so well known and so constantly acted upon by courts of justice as to render any long citation of authorities unnecessary. It may be proper, however, to cite a few opinions of judges that place the rule and the reason of it in a clear light. In Rutland's case (5 Co. 26), which is the leading case on the subject, it is said by the court: "It would be inconvenient that matters in writing, made by advice and on consideration, and which finally import the certain truth of the agreement of the parties, should be controlled by averment of the parties, to be proved by the uncertain testimony of slippery memory. And it would be dangerous to purchasers, and farmers, and all others, in such cases, if such nude averments against matter in writing should be admitted."

In a recent case in the English House of Lords (Shore v. Wilson, 9 Cla. & Fin. 565), Chief Justice Tindal expressed himself in the following words: "The general rule I take to be that where the words of any written instrument are free from ambiguity in themselves, and where external circumstances do not

create any doubt or difficulty as to the proper application of the words as to claimants under the instrument or the subject matter to which the instrument relates, such instrument is always to be construed according to the strict, plain, common meaning of the words themselves; and that in such case evidence *dehors* the instrument, for the purpose of explaining it according to the surmised or alleged intention of the parties to the instrument, is utterly inadmissible. If it were otherwise, no lawyer would be safe in advising upon the construction of a written instrument, nor any party in taking under it; for the ablest advice might be controlled, and the clearest title undermined, if, at some future period, parol evidence of the particular meaning which the party affixed to his words, or of his secret intention in making the instrument, or of the objects he meant to take benefit under it, might be set up to contradict or vary the plain language of the instrument itself."

The language of Judge Taylor, in Smith v. Williams, 1 Murphey, 430, has often been quoted as an able statement of the law on the subject under consideration: "The first reflection that occurs to the mind upon the statement of the question, independent of any technical rules, is that the parties, by making a written memorial of their transacton, have implicitly agreed that, in the event of any future misunderstanding, that writing shall be referred to as the proof of their act and intention; that such obligations as arise from the paper by just construction or legal intendment shall be valid and compulsory on them; but that they will not subject themselves to any stipulations beyond the contract, because, if they meant to be bound by any such, they might have added them to the writing, and thus have given them a clearness, a force, and a direction, which they could not have by being trusted to the memory of a witness."

The rule as declared in the foregoing opinions has been adopted in all the treatises on the law of evidence. It is tersely expressed by Mr. Phillips, in these words: "It is a general rule that extrinsic evidence cannot be admitted to contradict, add to, subtract from, or vary, a written instrument." This rule has no reference to the statute of frauds or other enactment requiring

certain contracts and instruments to be in writing. It is an old rule of the common law, adopted long before such enactments were made. The case quoted above from Coke was decided nearly a century before the English statute of frauds was passed.

The principal ground taken on the other side to justify the introduction of the parol testimony has been that the writing contained only a part of the agreement. Accordingly, when the witnesses of the administrator were asked if the agreement was in writing, they answered "It was partly in writing and partly verbal." Now, it is true that, where parties enter into a written agreement, and on the same occasion make a verbal contract in relation to some different and independent subject matter, the writing will not prevent the parties from proving such other contract. But, plainly, this principle has nothing to do with the case before the court.

Again, where a written instrument on its face shows that there are terms not included in the writing, these terms may be proved by parol. But where, as in the present case, the instrument is complete in itself, it is never permitted to add to the instrument by showing the existence of stipulations not expressed in the writing; for such a practice would effectually overthrow the rule that prohibits the varying of written instruments by oral testimony.

Several cases have been decided by the Supreme Court of this State that illustrate and confirm the positions taken above. Thus, in Ashley v. Bird, 1 Mo. 640, a written power of attorney was read authorizing the attorney "to act in all my business, in all concerns, as if I were present myself, and to stand good in law, in all my land and other business." It was then proposed to show by parol that it was the true understanding of the parties that the attorney was authorized to sell lands. The court said that no case could be found to justify the reception of such testimony. The point was decided expressly under the rule of the common law; and the court, in its opinion, refers to Phillips's Treatise on Evidence, quoting the passage which has been set out above in this brief.

So, in Lane v. Price, 5 Mo. 101, a slave had been hired for a year, by writing. An offer was made to show that, at the time

of hiring, it was agreed that if the slave became sick the master was to incur the expense of the sickness, and the wages were to cease. The court held the evidence inadmissible, as adding terms to a written instrument.

So, in Woodward v. McGaugh, 8 Mo. 161, a defendant, being sued on a note as surety, offered to show that it was agreed by the plaintiff that he would not hold him responsible on the note, as an offset to the note existed large enough to satisfy it. The court decided that the testimony was inadmissible.

In Cockrill v. Kirkpatrick, 9 Mo. 697, a note was payable in the currency of the State. It was proposed to prove that the real agreement was that the note should be paid in certain depreciated bank notes that were in general circulation. The court held that, under the rules of evidence, the testimony was inadmissible, and the contrary doctrine was stigmatized as "most monstrous and mischievous."

The court is also referred to Gooch v. Conner, 8 Mo. 381, and Jones v. Jeffries, 17 Mo. 577.

In most of the cases just cited the testimony offered was consistent with the written agreement, and this circumstance gave to the offer some air of plausibility; but in the case now before the court the agreement made out by the oral testimony is in flat contradiction to that expressed in the writings.

By the terms of the written agreement, the shares of the parties were fixed precisely according to the decree of the Probate Court; that is, Dr. Beck was to receive two-thirds of the whole estate and one-ninth of the remaining third, while Mrs. Beck was to receive, as guardian of her three children, three-ninths, and Mr. Silver one-ninth, of the remaining third. The administrator was advised of this agreement, and authorized to give any indulgence to Mrs. Beck and Mr. Silver that would not impair the rights of Dr. Beck under the settlement. Under the agreement by parol, as testified to by the parties on the other side, the position of the parties becomes inverted; that is to say, Silver and Mrs. Beck take $58,000, which is nearly the share of Dr. Beck, and to the latter is left $11,000, which is about the shares of Silver and Mrs. Beck.

It is charged that the writings are ambiguous, and need the help of explanatory oral testimony. It is believed that this charge .is unfounded. Whatever criticisms the reader may indulge in respecting the language of the instruments, their meaning cannot be mistaken. The writing containing the compromise between the parties adopts the decree of the Probate Court, and is not susceptible of misconstruction. The letter of Dr. Beck to the administrator, however inaccurate or unrhetorical, would be readily understood by any reader of common intelligence. Although there is considerable discretion confided to the adminstration in extending indulgence and favor to Mrs. Beck and Silver, in respect to their obligations to the estate, the injunction is precise and explicit to impair in no way the rights of Dr. Beck, as fixed by the decree and the compromise. It is manifest that the administrator comprehended the writings. His mistake consisted in lending an easy and credulous ear to the representations of the other parties.

Particular stress is laid by the other side on the testimony of Limerick, to the effect that when, after the surrender of the obligation to Mrs. Beck, he met Dr. Beck at St. Louis, the latter expressed gratification at the result, and approved the action of the administrator. But it is obvious that this testimony stands on the same footing as the rest, and is nothing else than an attempt to vary the terms of the written instrument by parol proof.

Something has been said in respect to the doctrine of estoppel having the effect of preventing Dr. Beck from objecting to testimony upon which the administrator has acted. But manifestly the doctrine of estoppel has no just application to the case. That doctrine concerns the effect of testimony, and not its admissibility. All that the case presents, having any analogy to estoppel, is the very rule invoked by the appellant, that where the parties have reduced their agreement to writing they are bound by it, and neither is permitted to vary its terms by any proofs outside the writing.

*Wash. Adams*, for respondent.

I. The construction given by Beck to his own agreement of compromise, and the construction given by him to his letter to

Bunce, and his verbal messages and orders to Bunce, were proper and admissible as evidence, without regard to any action had by Bunce on them. It was not offered to vary or enlarge or in any manner alter the written agreement or letter, but to show how Beck himself understood and construed his own letter and contract. The constructions given by parties to their own writings are always heard by the courts as proper guides to their meaning. (25 Mo. 21 ; 2 Watts & Serg. 175.) The verbal messages from Beck to Bunce were also admissible, as giving independent and additional authority. (Sto. Ag. §§ 74, 79–81.)

II. But after Bunce had acted on Beck's verbal orders and messages, and delivered up the notes to be canceled, the question as to the admissibility of this evidence was put to rest. An estoppel *in pais* was thereby created. The matter passed beyond the control of these parties, and it would be an outrageous fraud and ruinous to Bunce to suffer Beck now to question the propriety of this act, which was induced by his own orders and advice. Whether right or wrong, the die is cast. He cannot "blow hot and cold," in a case like this, at his own pleasure. (Taylor & Mason v. Zepp, 14 Mo. 488 ; Newman v. Hook, 37 Mo. 207 ; Chouteau *et al.* v. Goddin *et al.*, 39 Mo. 250 ; Driskill v. Matier, 31 Mo. 326 ; 8 Wend. 481 ; Darrell v. Odell, 3 Hill, 219.)

WAGNER, Judge, delivered the opinion of the court.

The controlling question in this case relates to the action of the Circuit Court in admitting testimony. It seems that Preston Beck, Jr., being domiciled at Santa Fe, New Mexico, died in the year 1858, and left a will by which he gave his estate to his kindred, nine in number. Administration was taken upon his estate at Santa Fe, and also in Cooper county in this State. As a large amount of personal assets, consisting for the most part of funds transmitted to this State by the administrator in New Mexico, had accumulated in the hands of the administrator here in 1860, it was agreed by the parties claiming under the will that each party might take from the administrator the sum of ten thousand dollars, by giving an obligation, with surety, to repay the same with interest. Under this arrangement Mrs. Juliet A

Beck, as guardian for her three children, who were named as legatees in the will, took from the administrator thirty thousand dollars, and gave an obligation for repayment, with William Limerick as surety. David H. Silver, who claimed a share through his deceased wife, who was one of the legatees, also took out ten thousand dollars under a like obligation. This was in the year 1860. By a construction put upon the law of New Mexico regulating successions, where the decedent left neither wife nor descendant, the father was forced heir to two-thirds of the estate, and the power of disposition by will was limited to the third part of the estate. Acting under this view, Preston Beck, Sr., father of Preston Beck, Jr., in the year 1861 made a will bequeathing all his interest in the estate of his deceased son to J. P. Beck, the appellant in this cause, and appointed him executor. Preston, Sr., died in the same year.

In 1862 J. P. Beck filed his petition in the Probate Court of Cooper county, setting forth his rights, as executor of Beck, Sr., to two-thirds of the estate of Beck, Jr., and also his right, as legatee, to one-ninth of the remaining third of said estate, and praying for a decree establishing the rights of all parties to said estate. On the hearing of the petition, the Probate Court decreed that J. P. Beck, as executor, was entitled to the two-thirds of the estate, and that the several legatees mentioned in the will of Preston Beck, Jr., were each entitled to one-ninth of the remaining third of said estate. From this decree Mrs. Juliet A. Beck and D. H. Silver appealed. Mrs. Beck, as executrix of her deceased husband, had prosecuted a claim against the estate of Preston Beck, Jr. This claim was allowed by the Probate Court, and amounted to $21,336.87. J. P. Beck disputed this allowance, and was about to institute proceedings to set aside the same. The right of Mr. Silver to a share in the estate was also in dispute, J. P. Beck insisting that, according to the law of New Mexico, the right of Mrs. Silver as legatee, upon the death of herself and child, passed to collateral kindred, to the exclusion of her husband. And in the meanwhile the administrator in Cooper county had commenced suits against Mrs. Beck and Mr. Silver, and their respective sureties, upon the obligations made to repay the

advancements out of the estate, as above mentioned. Pending all this litigation a treaty for compromise was opened, and resulted in an amicable settlement between them. The terms of the agreement were reduced to writing. According to the written agreement Beck withdrew his opposition to the claim allowed to Mrs. Beck, as executrix of her husband, and consented that she should receive the same from the estate. Mrs. Beck, on her part, admitted the claim of Beck to two-thirds of the estate and one-ninth of the remaining third, and agreed to dismiss her appeal and leave the decree of the Probate Court in force. A similar compromise was effected with Silver.

When the settlements were made, Beck gave to Mrs. Beck and Mr. Silver, each respectively, a written letter addressed to Bunce, administrator, stating the terms of the agreement, and authorizing him to deliver up to the parties " any papers, notes, or documents that will not infringe on my two-thirds," etc., and to desist from the further prosecution of the suits for any money allowed in the settlements.

Upon the presentation of these letters and certain verbal representations made by Mrs. Beck and Silver, Bunce dismissed the suits, and in January, 1866, presented for settlement to the Probate Court his account as administrator, in which he claimed credit for the obligations of Mrs. Beck and Silver, as having been delivered up on the order of Beck. These items of credit were objected to by Beck, but were allowed by the Probate Court, and Beck appealed to the Circuit Court. The Circuit Court gave judgment for Bunce, which, on appeal, was affirmed in the District Court. On the trial certain evidence was introduced on the part of Bunce, which was objected to as inadmissible, on the ground that it tended to alter and contradict the letter addressed by Beck to Bunce, and which writing, it is contended, did not authorize his action in dismissing the suits and delivering up the notes.

The questions put to the witnesses asked them directly what Beck said concerning the letters and their meaning. The witnesses answered that after the letters were received, and before they were delivered to Bunce, they had conversations with Beck,

and desired him to explain them so that they could be understood, and he replied that Bunce was a man of sense, and would understand them, and would give up the notes on the letters; that if he did not do this he would have no sense. He assured Mrs. Beck she should have no more trouble about the note. To Silver he said that Bunce, on the presentation of the letter, would not refuse to surrender up the note and dismiss the suit; and that if Bunce did so refuse he would go to Boonville in person and have the business settled as understood between them. And after the suits had been dismissed he expressed himself as gratified at the result.

The inquiries were made and the responses given with a view to show what interpretation Beck placed upon the letters which contained his view of the agreement, and are certainly, in some particulars, at variance with it. It is an established rule that oral testimony is not admissible to vary or explain written instruments. The principle is nowhere better laid down than by Greenleaf, who says that "where parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of the undertaking, was reduced to writing; and all oral testimony of a previous *colloquium* between the parties, or of a conversation or declarations at the time when it was completed, or afterward — as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties — is rejected." (1 Greenl. Ev. § 275.) - Phillips tersely enunciates the rule: "It is a general rule that extrinsic evidence cannot be admitted to contradict, add to, subtract from, or vary, a written instrument." (2 Phil. Ev., Edw. ed., 637.) The cases in this court are uniform, sustaining the same doctrine. (Ashley v. Bird, 1 Mo. 640; Lane v. Price, 5 Mo. 101; Woodward v. McGaugh, 8 Mo. 161; Gooch v. Conner, *id.* 391; Cockrill v. Kirkpatrick, 9 Mo. 697; Jones v. Jeffries, 17 Mo. 577.) So, it has been held that parol evidence is not admissible to prove how a written con-

tract was understood by either of the parties, in an action upon it at law, in the absence of any fraud. (Bigelow v. Collamore, 5 Cush. 226; Harper v. Gilbert, 5 Cush. 417; Gould v. Norfolk Lead Co., 9 Cush. 338, 345.)

The court, however, where the meaning is doubtful, will, in proper cases, receive evidence in aid of its judgment. (Hutchinson v. Bowker, 5 Mees & W. 535.) And where it is doubtful whether a certain word was used in a sense different from its ordinary acceptation, it will refer the question to the jury. (Simpson v. Hargitson, 35 Leg. Obs. 172.) But where a written memorandum of a contract does not purport to be a complete expression of the entire contract, or a part only of the contract is reduced to writing, the matter thus left out of the writing may be supplied by parol evidence (Rollins v. Claybrook, 22 Mo. 405; Moss v. Green, 41 Mo. 389); and stipulations and agreements subsequent to the execution of the writing are not within the rule. Parties may, by a subsequent parol agreement, upon a sufficient consideration, change the mode of payment or other terms of their written contract; or they may discard it altogether. (Lord v. Treadwell, 3 Fairf. 441; Bailey v. Johnson, 9 Cow. 115, 118; Trumbo v. Cartwright, 1 Marsh. 582; Perrine v. Cheeseman, 6 Halst. 174.)

And it makes no difference, it appears, how soon after the execution of the written contract the parol one was made. If it was, in fact, subsequent, and is otherwise unobjectionable, it may be proved and enforced. Thus, where the parties entered into a contract in writing regarding the sale of personal property; and immediately after it was signed the vendee said he wanted a written indemnity against all claims on a portion of it, to which the vendor replied he would not give him a written indemnity, but that he had sold him the whole and would see him out in it, it was held that this was a valid promise of indemnity, and, having been made after a written contract, it might be sued upon and a recovery had, and was perfectly admissible in evidence. (Brewster v. Countryman, 12 Wend. 446; S. P. Richardson v. Hooper, 13 Pick. 446.) In the present case it clearly appears that the parol authorization relied upon was made after the written agreement

was signed by the parties, and, if otherwise unobjectionable, would be competent according to the above rule. But the difficulty in the way is, that it does not appear by the record that the parol orders given by Beck for the dismissal of the suits were independent of the written letters, but that they were explanatory of, and in some instances contradictory of, them. If Beck, independent of the writings and outside of them, orally told Mrs. Juliet A. Beck and Silver to tell Bunce to dismiss the suits because a compromise had been effected, the evidence would have been entirely competent, and would have amounted to a full justification of Bunce's action in the premises, and would also have constituted an estoppel in Bunce's favor against future liability. That such was actually the fact would seem inferable from Beck's expressing his satisfaction at what Bunce had done after the suits were dismissed.

But the evidence was clearly incompetent and inadmissible in the shape in which it is presented in the record, and the judgment will therefore be reversed and the cause remanded for a new trial in conformity with this opinion. The other judges concur.