Bunce, Adm'r of Beck, Jr., v. Beck, Ex'r of Beck, Sr.

————————•————————

HARVEY BUNCE, ADMINISTRATOR OF ESTATE OF PRESTON BECK, JR., DECEASED, Defendant in Error, *v.* J. P. BECK, EXECUTOR OF ESTATE OF PRESTON BECK, SR., DECEASED, Plaintiff in Error.

1. *Estoppel in pais—Admissions—Directions.*—One is estopped from denying the right of another to do an act which was done under his direction, where an injury would result to the other from allowing the right to be disproved. There is no difference between estoppel by admission and direction, only that in the latter case the injustice of holding the party doing an act responsible to the person whose directions are followed, is even more apparent than in the former.

*Error to First District Court.*

*W. B. Napton, G. P. Strong,* and *N. Holmes,* for plaintiff in error.

I. The admission of the new depositions of Limerick and Mrs. Beck was against well-established rules of chancery practice—

rules that were not based upon any mere forms peculiar to English practice, but founded upon the regulations essential to insure justice and to keep out perjury. These witnesses had been thoroughly examined, cross-examined, and re-examined on all the points of fact which had occurred or could occur in the several interviews testified to. To allow their re-examination, after telling them wherein their testimony did not meet the case, is, to say the least, anomalous, dangerous practice, and against all the rules of chancery practice. (See 3 Greenl. 295, § 336, pt. 6, Redfield's ed. ; Story on Eq. Pr., etc.) This is a proceeding according to the practice and principles of the chancery and ecclesiastical courts of England, and not according to the course of the common law; the facts are determined by the court, not by a jury. (Adams' Eq., by Brigham, 250, note 1 ; 19 Ala. 438 ; 20 Ala. 662 ; Miller v. Iron County, 29 Mo. 122 ; North Mo. R.R. Co. v. Green, 34 Mo. 159 ; Jones v. Brinker, 20 Mo. 87.)

II. All the conversation, as detailed by the witnesses (Mrs. Beck and Limerick), related to the meaning and effect of that letter. Not a word about independent orders. All the evils to be guarded against by excluding oral testimony relating to the meaning and effect of written contracts, would be admitted if one word of this testimony could be introduced.

*Wash. Adams*, and *Draffen & Muir*, for defendant in error.

I. An estoppel *in pais* being created, it would be an outrageous fraud, and ruinous to Bunce, to suffer Beck to question the propriety of this action of Bunce, induced as it was by his own conduct and orders. (See the case of Taylor *et al.* v. Zepp, 14 Mo. 482 ; Chouteau v. Goddin *et al.*, 39 Mo. 250 ; Darrell v. Odell, 3 Hill, 219 ; Bunce v. Beck, 43 Mo. 266.)

II. The point made by the defendant, that the new depositions of Mrs. Juliet A. Beck and Wm. Limerick could not be read as evidence because depositions of the same witnesses were then on file, has no foundation in law or reason, as applied to the courts of this State. The old English chancery practice in regard to depositions, orders of publication, passing publication,

etc., have never been adopted in this State, and are wholly inconsistent with our statute laws and practice in civil actions. In our practice, all actions are civil actions and all tried like actions at law. The modes of proof are precisely the same in all civil actions. If the depositions are not sufficiently definite, either party has the right to retake them and make out the points he may desire to prove.

BLISS, Judge, delivered the opinion of the court.

This case was before the court at the January term, 1869; and is reported in 43 Mo. 266, and the law of the case upon the additional facts now developed was substantially declared in the opinion there given.

It appears that Mrs. Beck, as guardian for her three children, had received an advance from the estate of Preston Beck, Jr., of $10,000 for each child, which amount had been distributed, with the knowledge of James P. Beck, to each of the other heirs as well. But to meet any contingencies that might arise, they or their guardians gave their notes to the administrator, and after the Probate Court had decided that the will of Preston Beck, Jr., could operate only upon one-third of his estate, and that James P. Beck, as executor, devisee and legatee of Preston Beck, Sr., was entitled to two-thirds of the whole as well as one-ninth of the remainder, Bunce, as administrator, deemed it necessary to call in these notes, and accordingly had commenced suit upon the one for $30,000 given by Mrs. Beck, and on the one for $10,000 given by Silver. They had appealed from the allowance of two-thirds of the estate to James P. Beck, and he was resisting a demand of $21,000 allowed to Mrs. Beck against the estate. She visited him in St. Louis for the purpose of adjusting their differences, and especially to obtain a discontinuance of the suit against her upon the note. A written agreement was entered into which embraced only the disputed claim of two-thirds and the allowance of the $21,000, and so far all would seem to be plain that there was no arrangement or understanding about anything else. But Mrs. Beck was not satisfied. She desired and expected the suit against her to be dismissed and her note to be

given up; and James P. Beck writes a letter to Bunce upon the subject, the same given in the statement of the case in 43 Mo. 266. But this letter did not satisfy her. She wanted a positive order to give up the specific note, while the letter directed him to give up "any papers, notes, documents, etc., that will not infringe," etc. Bunce held no other note, but he might not know whether its surrender would infringe upon James P. Beck's right to the two-thirds and one-ninth of the estate or not. A portion of the estate was still in New Mexico, of which he knew nothing, and it was his duty to distribute the estate here according to law, and the letter as written would throw a burden upon him which he would not be likely to assume. Mrs. Beck and Limerick, who was aiding her, understood that the letter called for the note and the discontinuance of the suit; still it was not direct and straightforward, and they wished it changed. But Beck refused to change it, and insisted that it meant as they understood it; that Bunce would give it up, etc., and to tell him so. As the testimony appeared when the case was formerly before us, it was doubtful whether J. P. Beck intended to send an absolute direction to Bunce to give up the note and dismiss the suit, or whether he intended to deceive Mrs. Beck about the meaning of the letter, and induce her to compromise the other matters by making her think that the matter of the note was also arranged. In our doubt upon the subject, and not to infringe the well-settled rule that every writing should speak for itself, we directed a new trial, and called the attention of the parties to a question of fact that had been left in doubt. We distinctly held then — and the position is not and can not be disputed — that if the defendant in error sent a message to Bunce, the administrator, to dismiss the suits and give up the notes, it would be a full justification of his action, and that Mr. Beck would be estopped from objecting to it.

A new trial has been had, and the attention of the witnesses has been called more distinctly to the time in relation to the delivery of the letter, and to the character of the directions sent by the defendant to the plaintiff; and from that testimony it plainly appears that defendant Beck not only told Mrs. Beck

and Limerick that the letter contained an order to give up to her the note and dismiss the suit, and that Bunce would so understand it, but both on the day when it was written and on the next day, when Mrs. Beck called for more specific directions, he told them to tell Bunce for him to deliver up the note and dismiss the suit, and that if he did not do it he would come up and do it himself.    As they were leaving he told Limerick that if Bunce had any hesitation to do as he had requested him, to telegraph him and he would come up himself and have the suit against Mrs. Beck dismissed.    On their return to Boonville Mrs. Beck handed the letter to Bunce, and he declined to act upon it because, although it contained a general order to give up all notes, papers, etc., it was indefinite, and seemed hampered by a condition. But when they told him what Mr. Beck had said he at once complied with his direction by giving her an order upon his attorneys to dismiss the suit and surrender the note.

If there were any doubt as to the kind of message sent by Mr. Beck and the way he intended it to be understood, that doubt would be removed by what occurred between him and Mr. Limerick after his return to St. Louis.    Upon this, Mr. L. testifies as follows: "I returned to St. Louis from Boonville.    I met Mr. Beck on Fourth street as I was returning from the railroad depot; he asked me what success Mrs. Beck had in Boonville.    I told him that Mr. Bunce had delivered to Mrs. Juliet A. Beck an order on Ryland & Son to dismiss the suit against her and to deliver up to her her note.    He appeared very much gratified, and said it had turned out as he had told me it would.    Mr. Beck requested me to hunt up Mr. David Silver and try and prevail upon him to make the same arrangements with him that he had made with Mrs. Juliet A. Beck," etc., etc.    After the settlement with Silver had been effected, Mr. Beck seems to have become dissatisfied with Mr. Bunce for giving up the notes, and inquired why he did it; and on Mr. Bunce asking why he sent him such messages by Mrs. Beck and Limerick, he replied that nothing else would satisfy them, plainly admitting that some messages were sent besides the letter.

From reading the testimony, it would seem that Mr. Beck was determined to sign no paper that would ignore his right to two-thirds of the estate and one-ninth of the remainder. And it would further seem that he meant Mrs. Beck and Limerick to understand that the suit against her was to be dismissed by Mr. Bunce, and her note surrendered. Whether he really intended to have Mr. Bunce so act, designing to look for his compensation to the New Mexican estate or to Mr. Bunce himself, as he is now doing, or whether he supposed he would disregard a verbal order, is, perhaps, not clear. There is reason to believe that in effecting a settlement of the main controversy respecting his right to two-thirds of the estate which he claimed in opposition to the will, he was willing to promise almost anything, taking care to keep himself right on paper, and thinking, perhaps, he would not be bound by what he might say. It is certain that he not only repeatedly gave an interpretation to his letter in accordance with the views of Mrs. Beck, but sent positive directions to Mr. Bunce to discontinue the suit against her and give up her note. Of this there can be no reasonable doubt, and I find no contradiction in this regard between the testimony given at the former trial and that offered at the last—there being only more clearness and precision in the last in regard to the times and connection in which they were given.

Finding such directions to be clearly proved, we have only to apply the principle of law announced when the case was last before us. Mr. Beck is clearly estopped from denying the right of Mr. Bunce to do what was done under his direction. It is of no manner of consequence what interest in the estate Mr. Beck is entitled to, or what were his secret motives in sending the message —whether he thought his words would not bind him, or whether he intended to look to the New Mexican estate for his compensation ; in a word, whether he acted fraudulently or honestly, the effect is the same. Judge Napton, in Taylor *et al.* v. Zepp, 14 Mo. 482, quoting Darrell v. Odell, 3 Hill, 219, says that "in order to constitute an estoppel *in pais*, there must be, first, an admission inconsistent with the evidence proposed to be given or the claim offered to be set up ; second, an action by the other

party upon such admission; third, an injury to him by allowing the admission to be disproved." This is quoted with approval in Newman v. Hook, 37 Mo. 207, and squarely meets the case at bar. There is no difference between an estoppel by admission and one by direction, only, in the latter case, when the direction is acted upon, the injustice of holding him responsible for such action to the person whose directions are followed, would be even more apparent than in the former.

With regard to the Silver note the testimony is not so clear, but, taken in connection with the other, no doubt can be entertained that the action of Bunce was warranted by the acts of Beck. It was as necessary to settle with him as with Mrs. Beck. That this appeal against Mr. Beck should be dismissed was of the highest importance to him, for until then his claim to two-thirds of the estate, in opposition to the will and in addition to his share under it, could never be considered safe. He could but realize the possibility, at least, that our courts would give effect to our own laws in regard to distribution and the power of disposition by will, and the possibility of failure in so establishing those of a distant territory, and of domicile under them, as to make good his claim. Accordingly we find him very anxious to effect the settlement with Mr. Silver as well, and that he sought the aid of Mr. Limerick in the matter. In regard to that, Mr. Limerick further testifies that "Mr. Beck manifested the greatest anxiety that I should find Mr. Silver that night (the night he reported Mrs. Beck's success in getting up her note), as late as it was, it being near eleven o'clock, and make the arrangement with him, as he, Beck, expected to leave the city next morning and wanted the matter fixed up that night before he left. Beck went with me to different places to find Mr. Silver, and at last we found him at the Planters' hotel. I told Mr. Silver what had been done, etc., and that I thought he could make the same arrangement with Mr. Beck," etc. He agreed to meet them next morning, and the same papers were drawn up as with Mrs. Beck, Mr. Beck insisting that under the letter he would be entitled to, and would get, his note. Silver and Mr. Beck were not on speaking terms, and Limerick acted somewhat as a go-between,

to bring about the settlement as requested by Mr. Beck; and when the letter was given to Silver, Mr. L. also gave him a letter of introduction to Mr. Bunce, stating that the same arrangement had been effected as with Mrs. Beck, whereupon he also gave him an order on Ryland & Son to dismiss the suit and surrender the note. It is perfectly clear that this action of Bunce was induced and brought about by Mr. Beck. His action in relation to the note of Mrs. Beck was expressly approved, and he was told, through Mr. Beck's agent for the settlement, that the same arrangement had been made as with her. What could he do but perfect that arrangement? and it is too late now to say that he went beyond his authority.

It is true, in regard to this general transaction there is some adverse testimony, especially that of Mr. Bulger, clerk of Mr. Beck, and it is also true that, in our view of the facts, we are compelled to consider the acts of Mr. Beck as somewhat crooked. But in view of motives and probabilities, we are compelled to regard the facts found by the Circuit Court, as warranted by the evidence as a whole, and the action of the District Court in affirming its judgment is affirmed. The other judges concur.