MEREDITH, Appellant, v. HOLMES, Respondent.

St. Louis Court of Appeals, March 1, 1904.

1. **EQUITY: Reforming Contract: Burden of Proof: Evidence.** One who seeks in equity to reform a written contract on the ground of mistake, has the burden of overthrowing, by evidence which is clear and convincing, the *prima facie* presumption that the contract expresses the agreement of the parties.

2. ——: ——: **Sufficiency of Evidence.** In an action to reform a written instrument on the ground of mutual mistake, and incorporate an additional stipulation by parol, the evidence is examined and held adequate to support a judgment for defendant.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood*, Judge.

AFFIRMED.

*Klein & Hough* and *Andrew M. Sullivan* for appellant.

(1) As to the grounds upon which a court of equity will reform a written contract sought to be reformed for mistake. 1 Story, Eq. Jur., sec. 152; Leitensdorfer v. Delphy, 15 Mo. 166; Bispham's Eq. Prin., sec. 190; Cassidy v. Metcalf, 66 Mo. 119; Craighead v. Tierney, 100 Mo. 276; Buggy Co. v. Woodson, 59 Mo. App. 550; Henderson v. Beasley, 137 Mo. 199. (2) As to the evidence required to prove a mistake, so as to warrant the reformation of an instrument. Leitensdorfer v. Delphy, supra; Able v. Ins. Co., 26 Mo. 59; Madsell v. Riddle, 82 Mo. 31; Fanning v. Doan, 139 Mo. 392. (3) If mistake is admitted, or clearly established, preponderance of evidence may be sufficient to show what the contract was intended actually to cover. Bunse v. Agee, 47 Mo. 270.

*Reynolds, Koehler, Reiss & Harlan* for respondent.

(1)   Before appellant is entitled to the relief prayed for he must show that there was a mistake, and that it was a mutual one between the parties, by testimony so clear and convincing that there is no doubt left in the mind of the chancellor. There must be a certainty of the mistake and that it was mutual; a preponderance of testimony in its favor is not sufficient Forrester v. Scoville, 51 Mo. 268; Parker v. Van Hoozer, 142 Mo. 621; Downing v. McHugh, 3 Mo. App. 594; Bartlett v. Brown, 121 Mo. 353; Steinberg v. Ins. Co., 49 Mo. App. 255; Sweet v. Owens, 109 Mo. 1; Clark v. St. Louis Transfer Co., 127 Mo. 255; Robertson v. Bobb, 139 Mo. 346; Bobb v. Bobb, 7 Mo. App., 501. (2)   Plaintiff's action in retaining the contract for sixteen months without intimation that a mistake had been made, during which time the situation of the parties had changed and the property securing the notes sold, is not only wholly inconsistent with his plea that there was a mistake, but his acquiescence constitutes such laches as will bar a recovery. American Ins. Co. v. Neiberger, 74 Mo. 167; Murdock v. Lewis, 26 Mo. App. 234; Reel v. Ewing, 4 Mo. App. 569.

STATEMENT.

The petition is in two counts; the first is to reform a written contract on the ground of mutual mistake; the second is to recover on the contract after its reformation. Without reformation, the second count states no cause of action. The contract as executed is as follows:.

"I, Dr. C. A. Meredith, agree to dispose of my Star Carriage Mfg. Co.'s stock, par value $2000, and notes due from said company amounting to not less than $1600, for the following considerations, viz:

"That J. S. Holmes shall deliver to me within

thirty days a $20,000 policy of life insurance issued by the Metropolitan Life Insurance Company, known as a fifteen-year endowment gold bond, that said J. S. Holmes shall deliver to me said policy, together with a receipt for $1497.40 as first year's premium, also that J. S. Holmes shall give to Dr. Meredith two notes (without interest) one for $350 to be paid September 27, 1899, and one for $1250, to be paid one year from date of above policy.

"It is understood and agreed that no obligation exists by virtue of this agreement unless said Metropolitan Life Insurance Company issues the above described policy, and unless Dr. Meredith can deliver the stock and notes as above described.

"It is also understood and agreed that said J. S. Holmes assumes all responsibility for the stock and notes belonging to Dr. Meredith after the transfer is legally effected, and all other financial obligations to the Star Carriage Manufacturing Co. up to this date, said assumption to take effect on the delivery of the above described policy and the handing over to J. S. Holmes of the stock and notes above described.

"Approved, J. S. HOLMES. C. A. MEREDITH."

The petition asks that the last clause of the contract be reformed so as to read as follows: "It is also understood and agreed that said J. S. Holmes assumes all responsibility for the stock and notes belonging to Dr. Meredith after the transfer is legally effected, and all other financial obligations of C. A. Meredith for or on account of the Star Carriage Manufacturing Company up to this date, said assumption to take effect on the delivery of the above described policy and the handing over to J. S. Holmes of the stock and note above described."

The evidence shows that the Star Carriage Manufacturing Company was a corporation operating a plant for manufacturing and repairing carriages, in the city of St. Louis, and owned some city lots upon

which it had a shed. The par value of the capital stock of the corporation was one hundred dollars. The plaintiff, in July, 1899, owned twenty shares, the defendant twenty-five shares of the stock. Plaintiff, defendant, H. M. Pierce and Otto C. Schaefer constituted the board of directors. The corporation owed plaintiff over sixteen hundred dollars for money he had advanced it. It also owed the Franklin Bank a note of four thousand dollars, indorsed by plaintiff, Pierce and Schaefer, and secured by a deed of trust upon its real estate shown to be worth from four thousand to forty-five hundred dollars. It also owed a note of three hundred dollars to Mrs. Lang, wife of the secretary of the company, indorsed by plaintiff and defendant. The annual statement of the previous year's business of the company, made June 30, 1899, showed that the company had made no money, and the plaintiff became dissatisfied with its management and was desirous of disposing of his stock and withdrawing from the company. With a view of getting out of the concern, he approached defendant and made him a proposition to sell out to him. Holmes suggested to plaintiff that he take a fifteen or twenty year five per cent gold bond policy for twenty thousand dollars in the Metropolitan Life Insurance Company of New York of which company Holmes was manager.

On July 30th plaintiff made the following proposition by letter to defendant:

"July 30th, 1899.

"John Holmes, Esq.,
        "City.
"Mr. Friend Holmes:
    "I have examined your prospectus of the $20,000 fifteen year gold bond endowment policy, and as you suggest I will make you the following proposition. I will transfer, or cause to be transferred, to you all my stock, $2000, all my papers against the company, and

about $1700 for the following consideration: You to give me above mentioned policy, with the receipt for the first year's premium, $1250 note for one year, $350 in cash, and one new storm buggy 'A' grade, you to assume responsibility for the stocks and papers and all my responsibility relative to the company. If accepted I feel as though it will be rather expensive to me, but I am thoroughly disgusted with the present management and do not care to be a party to a change, would rather know that I am entirely out. Please let me know your pleasure in the matter to-morrow.

"Respectfully,

"C. A. MEREDITH."

The defendant replied as follows:

"St. Louis, Mo., July 31, 1899.

"My Dear Doctor:—Sorry I could not see you to-day. I leave to-night for St. Joe and expect to be back Wednesday a. m. May be able to make some arrangement with you altho' I can not accept your proposition. With kindest regards, I remain,

"Very sincerely yours,

"J. S. HOLMES."

A few days after this, plaintiff called at defendant's office and the terms of the contract were discussed, resulting in a request from defendant that plaintiff write out a memorandum of what he wanted, whereupon plaintiff, as he testified, wrote out the following memorandum in pencil:

"I have this day sold to Mr. J. S. Holmes all my stock, notes and accounts in and against the Star Carriage Manufacturing Company for $20,000, fifteen pay gold bond policy, paid for one year, $1250, six per cent note, payable before second premium falls due, $350 within 40 days, and one new storm buggy finished and completed; to be relieved from all obligations relative to Star Company."

Plaintiff testified that after he wrote out this memorandum, the defendant then wrote out the contract in detail.  His testimony is as follows:

"Q.  Then, Mr. Holmes wrote up a paper in pencil or pen and ink?  A.  Yes, sir.

"Q.  And he told the stenographer to make a copy?  A.  Yes, sir.

"Q.  And then did the stenographer bring back this paper?  A.  Yes, sir, and a copy.

"Q.  A duplicate of it?  A.  A duplicate of it.

"Q.  Now, when he first brought it did it have everything on it that is there now, or was there something added to it?  A.  Our names were added, nothing else.

"Q.  Well, now at what time did you call his attention to the fact that it did not include the assumption of your liabilities?  A.  Well, in writing the contract, when it came down to that last clause, 'It is also understood and agreed that said John S. Holmes assumes all responsibility for the stock and notes belonging to Dr. Meredith after the transfer is legally effected,' I suggested to him at this juncture that—

"Q.  Well, now, wait a minute.  Now he had written that in the paper, had he?  A.  Yes, sir, and I suggested to him at this juncture that it did not cover my indorsements and he says, 'and all other financial obligations to the Star Carriage Manufacturing Company.'

"Q.  And did he write that down?  A.  Yes, sir, he wrote it down.

"Q.  On that paper?  A.  On that paper.

"Q.  And then the stenographer produced this paper did he?  A.  Yes, sir.

"Q.  Now then, when the stenographer brought this paper what was done?  A.  Mr. Holmes read aloud one of them and then we signed them.

"Q.  That is, you signed them and he marked them 'approved' and signed his name.  A.  Yes, sir;

Meredith v. Holmes.

we compared them one with the other to see if it was all right.

"By the Court. Now let me understand that.

"Q. After this pencil memorandum had been made by you of what the terms of the contract were to be, then the paper marked Exhibit No. 3 was handed to the stenographer? A. No; no, sir.

"Q. Oh, Mr. Holmes then sat down and wrote up another memorandum, did he? A. Well, he wrote it out in detail, you know, that is, just the subject that was to be contained in it.

"Q. He wrote it as to the form of the contract, did he? A. Yes, sir.

"Q. And approved of the contract? A. Yes, sir.

"Q. Did he have your memorandum before him when he wrote that out? A. Just the pencil statement.

"Q. How did he write it out—did he write it out in ink? or with a pencil? A. He wrote it out in pencil or in ink, I disremember as to which, your Honor.

"Q. Well, that was handed to the stenographer, was it? A. The stenographer wrote it, yes, sir.

"Q. By Judge Klein: But before he handed it to the stenographer you called his attention to the fact that it did not include the matter of you indorsement? A. When he was writing it, yes, sir.

"Q. And then you added that to his memorandum that he was writing? A. Yes, sir; 'and all other financial obligations to the Star Carriage Manufacturing Company.'

"Q. And after this was done he handed his paper to the stenographer and the stenographer wrote it off on the typewriter? A. Well, there is another clause there after that relative to the date of it and the handing over to Mr. Holmes of the stock and notes and him handing over the papers to me—in other words, that it should not have any effect unless—

"Q. Unless you got the gold bond from the life insurance company and delivered your stock to him? A. Yes, sir.

"Q. Now, Dr. Meredith, at the time when this paper was signed by you what, if anything, did you owe to the Star Carriage Manufacturing Company? A. I owed nothing to the Star Carriage Manufacturing Company.

"Q. Did the Star Carriage Manufacturing Company owe anything to you? A. Yes, sir; they owed me sixteen or seventeen hundred dollars. . . .

"A. No one was present when the contract was drawn except an agent came in occasionally into the office while he was writing the contract, and Mr. Current came in at that time. He was a clerk for Mr. Holmes.

"Q. By the Court: Did you stay there until the agreement was typewritten? A. I did.

"Q. Did you read it after it was typewritten? A. Mr. Holmes read it aloud.

"Q. Well, didn't you have it in your hands? A. I had one copy in my hands and Mr. Holmes had the other copy in his hands.

"Q. He read it out loud? A. Yes, sir.

"Q. By Mr. Harlan: You followed him with your copy? A. I followed him, yes, sir.

"Q. By the Court: Did you make exceptions at the time or corrections after it was typewritten? A. I did not.

"Q. By Mr. Harlan: When you handed this memorandum to Mr. Holmes, Ex. 3, it was after that that he wrote the contract? A. Yes, sir. I was present all the time and saw him write out the contract, and then it was sent to the stenographer. Two copies were made on the typewriter. I waited until it was finished. I held one copy in my hand as Mr. Holmes read out the other and no suggestion was made of any change and both parties signed it."

Plaintiff testified that the note of the company to the Franklin bank, on which he was an indorser, was not mentioned at the time the contract was made, but that defendant, being a director in the corporation, knew of the existence of the note and knew that he had indorsed it and that some months previous he had mentioned to the defendant the fact, that he and Pierce had paid interest on the note, and that nothing whatever was said about this note when the contract was entered into. Plaintiff testified that he thought the capital stock of the company was worth its par value at the time the contract was made.

The evidence shows that both plaintiff and defendant fully complied with the contract on their respective parts as it is written. The four thousand dollar note was not paid and the deed of trust given to secure it was foreclosed. Plaintiff, being the highest and best bidder at the trustee's sale, got the city lots of the corporation for twenty-five hundred dollars. After paying the expenses of the sale and interest notes that were due, the balance of $1,433.50 was applied to the credit of the principal of the note. Plaintiff has since paid the balance of the note. After the sale under the deed of trust, the carriage company went into the hands of a receiver or trustee who was able to pay about twenty per cent of its liabilities from its assets. The defendant paid the Lang note but never called upon the plaintiff for contribution.

The defendant testified that he did not write out the contract; that it was written out by the plaintiff and then copied on a typewriter, and that the typewritten copy followed the original as written by the plaintiff; that nothing was said about his assuming the four thousand dollar note to the Franklin Bank or any other note, and that he never agreed to assume the payment of any of the company's notes on which plaintiff was an indorser; that he paid the three hundred dollar Lang note for the reason he was getting ready to move to New

York and was threatened with an attachment if he **did** not pay the note and that hé paid it to avoid an attachment.   He also testified that there was a dispute between plaintiff and the carriage company about the cost of repairing a buggy which the plaintiff had torn up, and that the clause in the contract in regard to his obligations to the company had reference to this dispute, and after the contract was entered into he paid thirty dollars to the company, the cost of repairing the buggy the plaintiff had torn up.  In rebuttal the evidence tends to show that there was no dispute between the company and defendant in reference to repairs on a buggy and the defendant never paid thirty dollars on account of repairing a buggy torn up by the plaintiff.

The court found the issues on both counts for defendant.   Plaintiff appealed.

BLAND, P. J. (after stating the facts as above.) — So strong is the legal presumption that a written contract, unambiguous and complete in itself, contains all the terms of the agreement between the parties, that parol evidence will not be heard in an action on a contract to vary or contradict its terms.   Evans v. Mfg. Co., 118 Mo. 548; Tracy v. Iron Works, 104 Mo. 193; Black River Lumber Co. v. Warner, 93 Mo. 374; Bunce v. Beck, 43 Mo. 266.   Corelated to this rule, is the rule in equity suits to correct a written contract, on the ground of mistake that casts upon the party asserting the mistake the burden of overthrowing, by evidence that is clear and convincing, the prima facie presumption, that the contract exhibits the ultimate agreement of the parties, and of showing that the mistake was mutual.    Judson v. Mullinax, 145 Mo. 630; Parker v. Vanhoozer, 142 Mo. 621; Sweet v. Owens, 109 Mo. 1; Gaylord v. Ins. Co., 40 Mo. 13; Benn v. Pritchett, 163 Mo. 560.

In plaintiff's letter of July 30th to defendant, he proposed, among other things, that the defendant should

assume all his responsibility for the stocks and papers and all his financial responsibility relative to the company. Defendant promptly answered that he could not accept this proposition. Every proposition contained in the letter, except the one to assume plaintiff's financial responsibility relative to the company, and to furnish a buggy, was ultimately accepted and was embraced in the contract, therefore, it is a reasonable inference that defendant's rejection of plaintiff's proposition of July 30th was on account of his unwillingness to assume plaintiff's financial responsibility relative to the company, that is, to save him harmless as an indorser upon the four thousand dollar note of the company to the Franklin bank. The only scrap of evidence tending to prove plaintiff's contention is the pencil memorandum offered in evidence and his testimony in respect thereto. He testified that he wrote this memorandum at the time the contract was made and that it was understood between himself and defendant that it was to be incorporated in the contract. Opposed to this evidence is, first, the fact that it was not copied into the contract; second, that a copy of the contract was handed to plaintiff after it was prepared; that he held the copy in his hand and followed the defendant as he read aloud the other (the carbon copy); that he is an educated physician and did not discover the mistake and never discovered it until after he was called on to pay the balance due on the note; third; that at no time during the negotiations between plaintiff and defendant was his liability as an indorser on this or any other note of the company ever discussed or even mentioned; fourth, the improbability that a sane business man would agree to pay $3,097.50 or its equivalent, as did the defendant, for a sixteen hundred dollar note on a concern whose solvency was in doubt, and two thousand dollars of its capital stock of uncertain value, and in addition thereto, agree to assume the liability of an indorser on a four

thousand dollar note. It seems to us that on the plaintiff's own showing, the weight of the evidence is against his contention that a mistake was made in writing up the contract. The judgment is for the right party under the evidence and is affirmed. *Reyburn* and *Goode, JJ.,* concur.