## DAVIS *et al. v.* SHAFER *et al.*

*(Circuit Court, W. D. Missouri, S. D.* May 16, 1892.)

**1. CONSTRUCTION OF CONTRACT—JOINT AND SEVERAL LIABILITY.**

A contract for the building of a creamery and cheese factory, which purports to be between the contractors, as parties of the first part, and the undersigned subscribers, as parties of the second part, whereby the parties of the first part agree to do the work, etc., for the sum of $6,850, and the parties of the second part agree to furnish at their own expense the necessary land and water for such building, and receive a credit on the contract therefor of $200, and the subscribers agree to pay the above amount on the completion of the building according to specifications; and the parties of the second part, the subscribers, agree as soon as the above amount is subscribed, or in a reasonable time thereafter, to incorporate under the laws of the state, fixing the aggregate amount of stock at not less than $6,850, to be divided into shares of $100 each, said shares to be issued to the subscribers in proportion to their paid-up interest therein, to which is attached a heading for the subscribers, thus: "Names of Subscribers. No. of Shares. Amount of Stock after Incorporation,"—which was signed by the defendants, as such subscribers, for various shares. *Held,* that this was a contract, *inter partes,* between the parties of the first part and the subscribers of the second part, whereby the subscribers became jointly and severally bound to the parties of the first part for the payment of the sum of $6,850.

**2. SAME—WRITTEN CONTRACT—PAROL EVIDENCE.**

The contract being plain and unambiguous, parol evidence as to the intention of the subscribers in signing it, or their understanding of its terms, is not admissible to vary its expressed terms. Nor are any statements made by the soliciting agent of the party of the first part, made while soliciting subscribers, as to the meaning and effect of the contract, in the absence of fraud or deceit, competent evidence.

**3. SAME—AMBIGUOUS PHRASES—INTERPRETATION BY PARTIES.**

Where the contract employs words and phrases of doubtful or ambiguous meaning and application, the construction placed upon it by the parties thereto by word and acts, especially where such construction has been acted on by the parties, should prevail over any mere technical, grammatical, or logical interpretation; but where the contract is free from ambiguity, and its meaning is clear in the eye of the law, such mode of construction is inadmissible.

**4. SAME—AGREEMENT TO FORM CORPORATION.**

The provision of the contract respecting the organization of the subscribers into a corporation in no wise affected the assumption of the subscribers of the payment of the sum of $6,850. That was a matter subsequent, *inter sese,* as to the subscribers, as to how their interests in the joint property afterwards should be held and managed.

**5. ALTERATION OF CONTRACT.**

When said contract was signed by the first four subscribers it provided for the payment in cash of the sum subscribed upon the completion of the work. Afterwards, to meet the requirement of subsequent subscribers, the provision was interpolated, allowing the subscribers to pay one third in cash, one third in 60 days, and one third in 4 months after the completion of work; the deferred payments to bear 8 per cent. interest from date. *Held,* that where there are several parties to an instrument, some of whom have executed it, and in the progress of the transaction it is altered as to some who have not signed it, without the knowledge of the first signers, but not in a part affecting the liability of the latter, and is then executed by the others, the contract is good as to the first signers, according to the terms agreed upon by them, and is good as to the subsequent signers, with the *addendum* obligation.

**6. WAIVER AND ESTOPPEL.**

Where the first signers of the contract are the managing committee of the property, with whom a copy of such contract, after all the subscribers have executed it, is left, and this committee afterwards accept the property from the contractors as completed according to contract, and certify that the contractors are entitled to their pay, retain and mortgage the property as that of the creamery company, *held,* that all the subscribers are deemed to have waived such alteration, or, at least, are estopped from asserting such alteration.

**7. SAME—ALTERATION OF MEMORANDUM.**

The following memorandum, placed opposite the name of one of said subscribers, "Only responsible for 3 shares," is to be regarded as a part of his undertaking, and qualifies the contract so as not to bind him for a greater sum than three shares. Its subsequent alteration without his consent would discharge him. And, having paid the sum subscribed by him, he is not estopped by the subsequent acceptance of the work from pleading such alteration.

*(Syllabus by the Court.)*

At Law. Action by Davis & Rankin against L. W. Shafer and others to recover money under a contract. Judgment for plaintiffs.

*Mann & Talbutt*, for plaintiffs.

*Goode & Cravens*, for defendants.

PHILIPS, District Judge. This is an action by plaintiffs, a firm doing business at the city of Chicago under the name of Davis & Rankin, to recover a balance due on the following contract:

"CONTRACT AND SPECIFICATIONS FOR COMBINED BUTTER AND CHEESE FACTORY OF CENTRIFUGAL POWER AND MACHINERY.

"We, Davis & Rankin, party of the first part, hereby agree with the undersigned subscribers hereto, party of the second part, to build, erect, complete, and equip for said party of the second part a combined butter and cheese factory, at or near Greenfield, Dade county, Missouri, as follows, to wit: Said building shall be constructed and finished in substantial accordance with the specifications hereon, in a thorough and workmanlike manner. The engine, boiler, and all other machinery and fixtures shall be properly set up, and shall be in good running order, before the party of the second part shall be required to pay for said factory. The parties of the second part do hereby agree to furnish at their own expense suitable land for said building, together with sufficient water on said lot for the use of the business, and they shall be credited therefor, as a payment on this contract, the sum of two hundred dollars, ($200.00;) and it is further understood that, in case the said second party shall fail to furnish said land and water within ten days after the execution of this contract, then the said Davis & Rankin, at their option, may furnish the said land and water. Davis & Rankin further agree to provide and keep hired at the expense of the stockholders an experienced butter and cheese maker for one year, if desired. The above building is to have a capacity for handling 16,000 to 20,000 pounds of milk per day. Said Davis & Rankin agree to erect said butter and cheese factory as set forth by the above specifications for sixty-eight hundred and fifty ($6,850) dollars payable in cash, or note as follows: One third cash when factory is completed; one third in secured notes, due sixty days after factory is completed; one third in secured notes, due sixty days after factory is completed. Notes to draw 8 per cent. interest from date. We, the subscribers, agree to pay the above amount for said butter and cheese factory when completed according to said specifications. Said building to be completed in ninety days or thereabout after the above amount ($6,850) is subscribed. As soon as the above amount of ($6,850) is subscribed, or in a reasonable time thereafter, the said subscribers agree to incorporate under the laws of the state, as therein provided, fixing the aggregate amount of the stock at not less than $6,850.00, to be divided into shares of $100 each, said share or shares as above stated to be issued to the subscribers hereto in proportion to their paid-up interest herein. It is hereby understood that Davis & Rankin will not be responsible for any pledge or promise made by their agents or representatives that do not appear in this contract, and made a part thereof either in printing or writing. For a faith-

ful performance of our respective parts of the contract we bind ourselves, our heirs, executors, administrators, and assigns.

"Executed this, the third day of August, 1889.

| "Names of Subscribers. | No. of Shares. | Amount of Stock. after Incorporation." |
|---|---|---|
| | | |

The aggregate of the sums subscribed was about $7,000. Over $4,000 of this subscription was paid to the plaintiffs, and on the failure to pay the balance of the $6,850 this suit was brought.

The answers admit the execution of the contract, and its completion and performance by the plaintiffs according to the specifications, and its acceptance by the defendants, who still hold and are operating the plant, as a voluntary association, without having incorporated as the contract contemplated. They interpose as a special defense: *First*, that the contract is only several, and that both by its terms and the understanding of the parties thereto the subscribers were to be bound only to the extent of the sums subscribed by them, which sums varied from one to three hundred dollars. And, *second*, that the contract when signed by them had in it a blank space between the words, "sixty-eight hundred and fifty dollars, payable in cash," and the words following, "We, the subscribers, hereto agree to pay the above amount," etc.; and the following words: "Or note as follows: One third cash when factory is completed, one third in secured notes due sixty days after factory is completed, one third in secured notes due four months after factory is completed, notes to draw 8% interest from date,"—are alleged to have been inserted in this blank space after the execution of the contract. And, *third*, that plaintiffs, by their declarations and acts, treated the contract as several, and not as a joint obligation. And, *fourth*, that the defendants afterwards, for a valuable consideration, executed a release to the defendants from their joint obligation to pay the whole of the contract price on condition of their paying the single amount of their respective subscriptions. And the defendants Jacobs & Co. plead further that at the time of making their subscription they wrote after the "$300," subscribed by them, the words, "only responsible for 3 shares." The replication took issue on the new matters thus pleaded. By stipulation of parties a jury was waived, and the case submitted to the court for trial.

The first question of prime importance is as to the purport of the contract. Does it impose a joint and several obligation on the subscribers to pay the whole contract price, or are they bound only severally to the extent of the sums respectively subscribed by them? To answer this question is only to read the contract. It declares in the opening paragraph that it is an agreement of "Davis & Rankin, parties of the first part, * * * with the undersigned subscribers hereto, parties of the second part." Then: "The parties of the second part do hereby agree to furnish at their own expense suitable land for such building, together with sufficient water on said lot for the use of the business, and they shall be credited therefor, as a payment on this contract, the sum of $200." This provision clearly shows that it was a joint undertaking.

The subscribers, the parties of the second part, as one act, at the expense of all, were to furnish the land and water, and as one person were to receive credit for the $200, and not each an aliquot part, proportionate to the amount by him subscribed. Then comes the following clause: "We, the subscribers, agree to pay the above amount for said butter and cheese factory when completed according to specifications." There is no ambiguity, no conceivable uncertainty about it. It is a plain, explicit, unconditional promise, for an expressed valuable consideration, to pay to Davis & Rankin "the above amount," which is $6,850. It could not well be more direct and positive. And by express provision of the statute the contract is joint and several. Rev. St. Mo. § 2384. Upon what recognized principle of law, then, can defendants stand for their contention that it was the intent and understanding of the parties that the defendants were to be bound only to the extent of the amount of subscription set opposite their respective names? It is elementary and unyielding law that "when parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing; and all oral testimony of a previous *colloquium* between the parties, or of conversation or declarations at the time when it was completed or afterwards, as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties, is rejected." 1 Greenl. Ev. § 275.

Phillips thus succinctly states the rule:

"It is a general rule that extrinsic evidence cannot be admitted to contradict, add to, subtract from, or vary a written instrument." 2 Phil. Ev. (Edw. Ed.) 637.

Nor is it competent for either of the parties to prove *aliunde* how a written contract was understood by either of the parties in an action at law in the absence of vitiating fraud. *Bunce* v. *Beck*, 43 Mo. 266; *Bigelow* v. *Collamore*, 5 Cush. 226; *Harper* v. *Gilbert*, Id. 417; *Gould* v. *Lead Co.*, 9 Cush. 338–345; *Michael* v. *Insurance Co.*, 17 Mo. App. 23; *Burress* v. *Blair*, 61 Mo. 133. The observation of Judge Taylor in *Smith* v. *Williams*, 1 Murph. 430, is quite applicable:

"The first reflection that occurs to the mind upon the statement of the question, independent of any technical rules, is that the parties, by making a written memorial of their transaction, have impliedly agreed that, in the event of any future misunderstanding, that writing shall be referred to as the proof of their act and intention; that such obligations as arise from the paper by just construction or legal intendment shall be valid and compulsory on them, but that they will not subject themselves to any stipulations beyond the contract, because, if they meant to be bound by any such, they might have added them to the writing, and thus have given them a clearness, a force and direction, which they could not have by being trusted to the memory of a witness."

No statements made by agents while soliciting parties to sign the contract as to how they understood its provisions, or even had they gone

so far as to say that the subscribers would not be required to pay more than the sum subscribed by each, could in this action control the explicit provision of the written instrument binding them for the payment of a given sum. *Wakefield* v. *Stedman*, 12 Pick. 562; *Hakes* v. *Hotchkiss*, 23 Vt. 232; *Paddock* v. *Bartlett*, (Iowa,) 25 N. W. Rep. 907; *Manufacturing Co.* v. *Hale*, (Kan.) 17 Pac. Rep. 601. The subsequent provision of the written contract respecting the organization of the concern and its erection into a business corporation under the state law in no wise affected the liability of the defendants for their already expressed assumption of payment of the contract price of $6,850. That was a matter subsequent, *inter sese*, as to the subscribers, as to how their interests and rights in and to the joint property thus acquired should be secured, fixed, and managed. It was upon the basis, among themselves, as stockholders to the extent of the sums paid by them in the corporate property and its earnings. On its organization the stockholder would become liable for the debts subsequently contracted by it to the extent only of his unpaid stock. Failing to organize as a corporation, the promoters of the scheme—the subscribers—would, *inter se*, be a joint stock association, and, as to creditors of the concern, they might be held as partners. *Martin* v. *Fewall*, 79 Mo. 401; *Smith* v. *Warden*, 86 Mo. 382; *Pettis* v. *Atkins*, 60 Ill. 454; *Bigelow* v. *Gregory*, 73 Ill. 197; *Wells* v. *Gates*, 18 Barb. 554. The heading to the subscription list appended to the contract is significant. "Amount of stock *after* incorporation," shows that the subscriber did not become such stockholder until after incorporation, and that the subsequent act depended upon himself, beyond the control of the plaintiffs.

Strenuous effort was made at the trial by defendants to show that by the subsequent acts and declarations of plaintiffs' agents, while trying to collect the subscription, in taking notes from individual subscribers for the amount of their subscriptions and the like, they placed upon the contract their own interpretation, that it was not designed to hold the subscribers for a sum greater than the amount of stock subscribed. Such evidence would be competent if suited to the case. Where the contract in question employs words or terms of doubtful or ambiguous meaning and application, the meaning and application given them by the parties to the contract and acted on by them should prevail over any technical, grammatical, or logical interpretation of the words and phrases. But where the contract is free from ambiguity, and "its meaning is clear in the eye of the law," such evidence is clearly incompetent. *Railroad Co.* v. *Trimble*, 10 Wall. 367; *Michael* v. *Insurance Co.*, 17 Mo. App. 23; *Chrisman* v. *Hodges*, 75 Mo. 413; *Miller* v. *Dunlap*, 22 Mo. App. 97. Rightfully understood, there was no legal or moral incompatibility in the claim of plaintiffs that these defendants are bound for the unpaid balance of the debt, and their efforts to collect the individual subscriptions by taking notes or otherwise as best they could. The circumstances attending the organization of such an enterprise contemplate that its success depends upon the subscription of enough stock to pay for the plant, without which no single subscriber would enter into it. It interests the

contractors, therefore, to obtain the requisite amount of subscription; and the usual course of proceeding in inaugurating such enterprises is for the contractors to collect and receive such subscriptions to an amount sufficient to pay the contract price. This course accommodates the subscribers. The conduct of the subscribers, indeed, invited the plaintiffs to this course. The correspondence in evidence between the plaintiffs and their agent on the ground at Greenfield shows that up to the day when the work was completed, and the same was accepted by defendants' committee as satisfactory, no complaint was made by defendants, or any objection made to the payment of the sums subscribed by them. This correspondence, which is a part of the *res gestæ,* shows that when pay day came trouble came. Some paid, while the minority shirked, skulked, and refused. It was the policy, as it was to the interests of plaintiffs, who were largely engaged through the country in inaugurating like industrial enterprises, to avoid friction, delay, and litigation. The letters show that plaintiffs, from their business house in Chicago, were solicitous that their collecting agent should settle with the subscribers on any reasonable terms which would obtain the money due them, and even submitted to delays and discounts. For defendants now to take shelter in these acts to escape their expressed undertaking, is to seek to take advantage of their own wrong.

As to the alteration of the contract. It is important to ascertain the facts pertaining to this issue before discussing the law, as it will eliminate some of the propositions contended for by counsel. Without reviewing in detail this evidence, the conclusion reached on the whole evidence and attendant circumstances is that, when the contract was signed by the first four subscribers, L. W. Shafer, Jacobs & Co., Harper & Co., and John A. Davis, the words alleged in the answer to have been written in the blank space were not then written therein, (the other parts of the contract being on printed form;) but they were inserted before the other parties signed it. I base this conclusion upon the fair and reasonable deduction from Mr. Davis' testimony. He undertook to assist plaintiffs' agent in securing the names, and went around with him to solicit and influence subscribers. He testified that at once they encountered the objection to the provision in the contract for a cash payment, and he stated to the agent that in the condition of the people (generally farmers) to whom they must look, cash payments would be an obstacle, and provision should be made for time, etc.; and it was a fact quite noticeable to the court at the trial that many of the unadvised defendants on the witness stand testified about something being said by the agent as to part cash and time on the balance, while denying that it was in the contract. And Mr. Jacobs stated on cross-examination that the writing was not in the contract when he signed it, and that he first noticed it in there after three or four had signed it. Superadded to which, is this potential fact: For what conceivable reason, consistent with business sense and the instinct of self-interest, could plaintiffs or their agent have inserted such a clause after the parties had signed the contract? As it then stood they were obligated to pay in cash on the

v.50 F.no.9—49

completion of the work, whereas by the interpolation they would be required to pay only one third cash, and have 60 days and four months extension on the balance. With or without the provision, any subscriber could pay the cash, and with it he could have time if desired. No advantage to the obligees is apparent, and no wrong to the obligors was done by the imputed insertion. There is the absence of any reasonable motive for plaintiffs to make said interpolation without defendants' knowledge or consent. Furthermore, the evidence shows that the subscribers committed the matter of the contract and this property to the management of an executive committee composed of four of their number, three of whom—Davis, Shafer, and Harper—were the parties who signed the contract before the interlineation was made. When the subscription list, in its present form, was completed, a copy thereof was left with defendants' committee, where it has ever since remained. In August of that year this committee, on behalf of the association, certified to the plaintiffs that they had selected and procured the tract of land upon which to erect "the combined butter and cheese factory," and recommended the plaintiffs "to proceed to erect said combined butter and cheese factory thereon according to our contract with you." On November 1, 1889, after they had this copy of the contract of subscription, this same committee, "for Greenfield Butter & Cheese Factory Company" certified to the plaintiffs, "in behalf of and for the stockholders of the Greenfield Butter & Cheese Factory Company of Greenfield, state of Missouri," that the plaintiffs, contractors as aforesaid, had "completed the same according to contract and specification, so far as we, with our inexperience, are able to ascertain. And we do hereby accept the same, and recommend that Davis & Rankin, contractors, be paid for same according to the terms of contract with them, as soon as a practical test shall be made showing the manufacture of butter and cheese, and 136 feet of additional piping for pump shall be furnished." These conditions having been complied with on the part of the plaintiffs, on the 18th day of November, 1889, this committee issued to plaintiffs an unconditional certificate, stating that they had "completed the same according to the contract and to our satisfaction, and we do hereby accept the same, and recommend that Davis & Rankin, contractors, be paid for same in accordance with our contract with them." This committee for the subscribers thereupon took possession of the property, have ever since held it, and have mortgaged it for debt. The only objection ever interposed by any of them up to the time when called upon for settlement was that they wished to be released individually from any further liability on payment of their respective subscriptions; and, among them, they have since paid over $4,000 of this sum. If the question were *res integra*, it would be difficult to discover any sound reason or ethics for discharging either the first or second set of subscribers from their obligation to pay. The second set are clearly individually bound, because the insertion antedated their subscription; the first four signers, because the interlineation was neither intended to defraud them, nor did it work to them any harm, nor did it secure any

advantages to the obligees. The contract, as signed by them, was complete, unconditional, binding them to pay cash on the completion of the work. That right remains to them, and the only effect of the added provision was to give them the option of other terms of payment. No such change, made without evil intent, and working no injury to the obligee, and securing no advantage to the obligor, ought, in my judgment, to be deemed material. The rule of *damnum absque injuria* ought to be applied to such case. The authorities in this state are otherwise. But courts have, from sheer force of reason and common sense, (which is the surest basis of justice,) felt constrained to temper the rigor of the rule against alterations to the extent that "where there are several parties to an indenture, some of whom have executed it, and in the progress of the transaction it is altered as to those who have not signed it, without the knowledge of those who have, but yet in a part not at all affecting the latter, and then is executed by the residue, it is good as to all." 1 Greenl. Ev. par. 568; 1 Add. Cont. par. 389; *Doe* v. *Bingham*, 4 Barn. & Ald. 672; *Hibblewhite* v. *McMorine*, 6 Mees. & W. 208; *Hall* v. *Chandless*, 4 Bing. 123. So it has been held that, where a mortgagor altered a mortgage after it was signed by his comortgagor, without the latter's knowledge or consent, by inserting therein a description of other property, the mortgage was valid as to both. It was good as to the first mortgagor as to the property described therein when he signed it, and it bound the second mortgagor as to the additional property as well as to the other property. *Van Horn* v. *Bell*, 11 Iowa, 465. So here the contract was complete when the first four subscribers signed it, but in the progress of its execution an alteration was made to meet the requirements of other parties, which merely extended to them the privilege of other terms of payment without affecting any existing right of the first obligors. It seems to me that it is a fit case for the application of the maxim *ubi eadem est ratio, eadem est lex*. But, waiving this proposition of law, the facts hereinbefore recited, as to the acceptance of the property upon the completion of the contract, the retention of the property and dealing with it as their own, clearly constituted a waiver and estoppel combined. Shafer, Harper, and Davis waived it when they accepted the building, machinery, and work. They ratified the contract through the executive committee, to whom the matter was intrusted by the subscribers, when they took possession of the building for the association, and they created a fatal estoppel by occupying it, treating and dealing with it as their own. As said by Chitty, J., in *Re Chesham*, 31 Ch. Div. 473:

"A man shall not be allowed to approbate and reprobate. If he approbate, he shall do all in his power to confirm the instrument which he approbates. * * * If a man approbate his obligation, he is confined to his adopting the instrument as a whole, and abandoning everything inconsistent with it."

See *Evans* v. *Foreman*, 60 Mo. 449; *Bibb* v. *Means*, 61 Mo. 289; *Guffey* v. *O'Reiley*, 88 Mo. 429; *Austin* v. *Loring*, 63 Mo. 22, 23; *Green* v. *Railroad Co.*, 82 Mo. 653–659; *Brown* v. *Wright*, 25 Mo. App. 54; *Imboden* v. *Insurance Co.*, 31 Mo. App. 321; *Mayor* v. *Sonneborn*, 113 N.

Y. 423, 21 N. E. Rep. 121; *Walker* v. *Mulvean*, 76 Ill. 18; *Rapalee* v. *Stewart*, 27 N. Y. 310; *Duff* v. *Wynkoop*, 74 Pa. St. 300; *Rau* v. *Little Rock*, 34 Ark. 303.

There is amply sufficient in the pleadings to present this issue. The petition avers and the answers admit the acceptance of the work. And it is specifically pleaded in the reply that said alteration in the contract was "there at the time defendants accepted the said creamery, took the deed to said property, and assumed the control of the same, and that the same was well known to the defendants." It is the legal effect of the facts pleaded, rather than the designation given them by the pleader, on which the law administers relief. *Greenwood* v. *Insurance Co.*, 27 Mo. App. 417; *Olden* v. *Hendrick*, 100 Mo. 534, 13 S. W. Rep. 821.

There is no inconsistency in fact or law between plaintiffs' denial of making the alleged alteration in the contract, and then alleging that defendants by their conduct and acts had waived or ratified the act, or had created an estoppel. The contrary rule is a relic of barbarism in practice, by which justice was subordinated to form. *Nelson* v. *Brodhack*, 44 Mo. 598; *Patrick* v. *Gaslight Co.*, 17 Mo. App. 462; *McCormick* v. *Kaye*, 41 Mo. App. 263. The observation of SHERWOOD, J., in *Bank* v. *Armstrong*, 62 Mo. 65, is to be understood with reference to the state of facts under consideration. The reply only tendered the issue of no alteration, without pleading any fact which would constitute a waiver or estoppel.

As to the release pleaded in the answers, it is only necessary to state the facts to show that it is without merit. After the plaintiffs had kept and performed the contract on their part, the duty and obligation devolved on defendants to pay the contract price. They declined to do so, however, unless plaintiffs would yield to their contention that the undertaking was that each subscriber was bound only to the extent of the stock subscribed, and unless the plaintiffs would also waive their right to file a mechanic's lien. Even had the agent been authorized thereto, the release would be inoperative. It is not predicated of any new, valuable consideration, and as such it is a mere *nudum pactum*. When a contract "has become executed wholly or in part by the passage of a consideration it cannot be discharged by a simple agreement, but only by performance of its terms, by a release under seal, or by an accord and satisfaction." *Foster* v. *Dawber*, 6 Exch. 839; 3 Amer. & Eng. Enc. Law, p. 890, § 56. "It is an old rule of the common law that the payment of a sum less than that which is due cannot operate as a satisfaction of the debt." Id. p. 895, § 67. The facts of this case do not bring this release within the bounds of the rule respecting the compromise of doubtful claims or the settlement of rights in a disputable contract. Aside from this, the agent, Burr, had no authority from plaintiffs to execute such a paper. By the contract itself it is stipulated "that Davis & Rankin will not be responsible for any pledge or promise made by their agents or representatives that do not appear in this contract, and made a part thereof, either in printing or writing." Parties are presumed to know the law. A collecting agent possesses only lim-

ited authority. As such he has no implied power to compromise debts or execute such a release. *Corning* v. *Strong*, 1 Cart. (Ind.) 329; *Ward* v. *Evans*, 2 Ld. Raym. 928; *Sykes* v. *Giles*, 5 Mees. & W. 645; *Miller* v. *Edmondston*, 8 Blackf. 291; *McHany* v. *Schenck*, 88 Ill. 357; *Pratt* v. *U. S.*, 3 Nott & Hunt. 106; Story, Ag. (9th Ed.) § 99; *Buckwalter* v. *Craig*, 55 Mo. 71; *Greenwood* v. *Burnes*, 50 Mo. 52. The managing committee for defendants were advised by this agent when they demanded such release that he had never done such a thing, and that he would communicate with his principals. Accordingly he did write to them on the 8th day of November, 1889, in which he stated that the company had had a meeting and advised the subscribers not to pay until the machinery was tested, and until plaintiffs would give them something to show that they would look to each subscriber for what he subscribed and no more, and unless the plaintiffs would not file a lien on the building. To this letter plaintiffs replied on the 11th day of November, 1889, in which the agent was authorized to concede the defendants the release against a mechanic's lien, "as they [defendants] are amply responsible, and, if they would force us to give it to them before they would settle, it would not be worth anything anyhow." No authority was given the agent to execute a release beyond the matter of the mechanic's lien. Instead of demanding to see the agent's written authority, after being advised that he would write to the plaintiffs, the committee accepted the mere parol statement of the agent. They could not thus bind the principals. Story, Ag. § 72; *Wilson* v. *Railroad Co.*, 114 N. Y. 487, 21 N. E. Rep. 1015; *Gair* v. *Tuttle*, 49 Fed. Rep. 198, (opinion recently filed in this court.) Neither the agency nor the extent of authority can be established by proof of the imputed agent's declarations and acts. *Anderson* v. *Volmer*, 83 Mo. 406; *Fougue* v. *Burgess*, 71 Mo. 389.

The only remaining issue is the defense interposed by Jacobs & Co., as to the allegation of the memorandum placed opposite their name on the subscription list. I credit the testimony of Mr. Jacobs, to the effect that at the time of the execution of the instrument the words "only responsible for 3 shares" were written in pencil just after the figures "300," which represented the value of the shares subscribed by them. Such memorandum or *addendum* belongs to the "four corners" of the instrument, and is as much an integral part of it as if it had been inserted in the body of the contract. "If such memoranda are at the foot or on the back of a note or other instrument when executed, they constitute a part of the contract." *Bay* v. *Shrader*, 50 Miss. 330; *Warrington* v. *Early*, 2 El. & Bl. 763; *Wait* v. *Pomeroy*, 20 Mich. 425; *Wheelock* v. *Freeman*, 13 Pick. 165; *Railroad Co.* v. *Atkison*, 17 Mo. App. 494; *Railroad Co.* v. *Levy*, Id. 504, 505; *Burchfield* v. *Moore*, 25 Eng. Law & Eq. 123. These words, then, are to be construed as if they had been inserted immediately after the chief clause obligating the parties of the second part to pay the contract price of $6,850. What, then, would be their legal import? For what purpose were they employed, except to qualify the extent to which Jacobs & Co. proposed by their signature to be bound? It would be strained and overtechnical to say that as

they used the words "3 shares" they intended only to place a limit on their responsibility as shareholders, and, as they would not become such until after incorporation, the term should be restrained to the subject-matter, rather than be extended to the general undertaking in the body of the contract. There could be no motive nor sensible object in employing such words as a limitation alone on their responsibility as to the other shareholders, as in no event could the shareholders be bound *inter se* or to general creditors for a greater sum than the amount of their shares. Mr. Jacobs testified that after reading the contract his apprehension was that it bound each subscriber for the whole sum, and that he so stated to the agent, and wrote the words of qualification for his protection against such construction. When the plaintiffs, through their agents, accepted the paper with this memorandum, they took it as a part of the contract of Jacobs & Co., and are bound thereby. There is no repugnancy between the general clause binding the subscribers to the payment of the entire sum and the limitation as to Jacobs & Co. It was a contract *inter partes*, being executed successively by the parties of the second part. When handed to Jacobs & Co. for signature, the transaction, as to them, is to be viewed as if they had interpolated the words before signing: "But as to Jacobs & Co. it is understood that they are bound only to the extent of $300." · In respect to the alleged alteration of this memorandum, it is sufficient to say that the words are somewhat blurred, but sufficient of them remains to satisfy my mind that they were there. The answer does not aver that plaintiffs made the defacement, nor does the evidence show by whom it was done, or how it occurred. If altered by the plaintiffs, it operated to discharge Jacobs & Co.; if done while in possession of plaintiffs, it devolved on them to explain it. The act of Jacobs & Co. in placing this qualification on their liability is a suggestive answer to the contention of counsel that it was the common understanding of the subscribers at the time of the execution of the contract that they were only to be severally bound to the extent of the shares respectively subscribed by them. The very fact that Jacobs & Co., who were the second signers of the contract, saw the sweeping terms of the obligation before their eyes, and placed such memorandum opposite their name, was sufficient to put every subsequent signer on his guard. It was a warning signboard to them. The argument of counsel that the subsequent signers should be deemed to have regarded this memorandum as equally applicable to themselves is not even plausible. The very reverse is the only reasonable inference. After being thus warned by the precautionary action of Jacobs & Co. in placing their names to the instrument without any qualification, the conclusion is inevitable that they swallowed the whole obligation. It follows that as to all the defendants duly served or appearing hereto, except as to Jacobs & Co., the issues are found for the plaintiffs. Judgment accordingly.