DAVIS & RANKIN BLDG. & MANUF'G CO. v. DIX et al.

(Circuit Court, Central Division, W. D. Missouri. October 16, 1894.)

1. ESTOPPEL IN PAIS.
    A contract for the sale and construction of a creamery was signed by the purchasers at the solicitation of the seller's agent. The purchasers failing to provide land on which to construct the creamery, the seller, as

permitted by the contract, procured land and erected the creamery in compliance with such contract, in the view of such purchasers. Soon after the contract was executed, and at various times afterwards, the latter sought to be released from, and refused to comply with, the contract for various reasons, which did not include any claimed alteration of it. *Held*, that the purchasers could not, in an equitable action by the seller to enforce such contract, set up an unauthorized alteration, of which the seller was ignorant, made by the agent after part of them signed it.

2. ALTERATION OF INSTRUMENTS—WHAT CONSTITUTES.

Where a contract signed "D. & R., The First Party, per B., Special Agent," shows on its face that the "first party" is "D. & R. Bldg. & Manfng. Co.," such agent may, after the contract is signed by the "second parties," without their knowledge, and before he delivers it to the principal, add, opposite the names "D. & R.," the words "Bldg. & Manfng. Co."

3. FOREIGN CORPORATION—ACT REQUIRING PUBLIC OFFICE TO BE KEPT WITHIN THE STATE—WHEN APPLIES.

Act Mo. April, 1891 (Laws 1891, p. 75), requiring foreign corporations, before being allowed to do business in the state, to keep public offices therein for the transaction of business, to file with the secretary of state copies of their charter, forbidding the incumbrance of their property in the state, etc., and providing that the act shall not apply to traveling salesmen soliciting business in the state for foreign corporations which are entirely nonresident, applies only to such corporations as conduct their business in the state in such manner as to give them a status there, and not to foreign corporations which merely sell their wares in the state through traveling salesmen.

4. CONSTITUTIONAL LAW—INTERSTATE COMMERCE.

If such act applies to foreign corporations who send traveling agents into the state to make contracts for the sale of goods and machinery kept and manufactured without the state, it is void as an interference with interstate commerce.

Bill by the Davis & Rankin Building & Manufacturing Company against L. V. Dix and others to recover the contract price of a creamery, and foreclose an equitable lien on land on which it was erected. Decree for complainant.

Silver & Brown, for plaintiff.

Edwards & Davison and W. S. Pope, for defendants.

PHILIPS, District Judge. This is a bill in equity filed by the complainant, an Illinois corporation, against the respondents, numbering about 45 persons. It is predicated of a contract for the sale and construction of a creamery, which is like that found in the case of Davis v. Shafer, 50 Fed. 765. The creamery was to be erected, as stated on the face of the contract, "at or near Jefferson City, or on Dix's farm." The respondents having failed to procure the lot of ground, with a supply of water, for the erection of the creamery, the complainant, pursuant to the provisions of the contract, proceeded to select the ground at or near Jefferson City, and to dig a well for water; and, as the title to this property was taken in the name of the complainant, this bill in equity is filed, alleging compliance with and performance of the contract on the part of the complainant, and asks a decree against respondents for the contract price, and for a foreclosure of the equitable right of the respondents in said land, and for the enforcement of the decree against the same, with judgment over against them for the residue. A part of the respondents answer

separately, interposing the plea of non est factum, while the other respondents, in their answer, inter alia, set up the fact of the alleged alteration of the contract relied upon by the first-named respondents; and allege this alteration was made before they signed the contract, and that they would not have executed the same had they known the same had been altered after the other respondents had so executed it. The plea of non est factum is predicated of the contention that the contract, as signed by the first-named parties, described the location for the creamery plant "at or near Jefferson City, on L. V. Dix's farm," and the alleged alteration consists in interpolating the word "or" just before the word "on," so as to make the prescription read "at or near Jefferson City, or on L. V. Dix's farm." There is a sharp conflict of evidence between the complainant and the respondents on the question of fact whether this word "or" was in the contract before it was signed by any of the parties. Blanchard, who was the soliciting agent who obtained the signatures of respondents to the contract, testifies that this word "or" was inserted in the contract at the instance and request of the respondent Dix, the first signer of the contract. On the other hand, the respondents' testimony tends to show that the word "or" was interpolated after some of the parties had signed. It is, however, quite impracticable, from the respondents' testimony, to determine with reliable accuracy after what particular signature to the contract this word was inserted. Accepting the testimony of Mr. F. W. Roer, county clerk of Cole county, it would appear that this alteration was not made later than the signature of respondent Thomas B. Mahan. Taking the evidence on the part of the respondents as true, it would appear that this word "or" was inserted to meet the objection of some of the subscribers to confining the location to the Dix farm; and Roer testifies that he heard the conversation between Mahan and Blanchard in which Mahan suggested that this change be made. How Mr. Mahan can be heard to complain of this alteration, when made at his suggestion, is not apparent. If it be conceded that this alteration was made, and that the effect in law would be to release those who signed the contract prior to the change, and that it ought likewise to operate in favor of the subsequent signers, on the ground that they executed the instrument in reliance upon its being obligatory upon all the predecessors, the important question arises, in view of all the facts and circumstances attending this transaction, ought the respondents to escape liability on the contract? This strife is a repetition of the facility and credulity exhibited by the average man in entering into such joint contracts, under the persuasive influence of canvassing solicitors, and a vague notion of either large profits that are in some way to accrue to them or the community by such projects. Too late discovering the responsibility assumed by them in signing such contract, and the probability that such enterprise will end only in disaster, they begin to cast about for some loophole of escape. The evidence in this case shows that, after this contract was executed and returned by the agent to the company at Chicago, the subscribers, in general and in particular, raised all manner of objections and reasons why they should not be held thereto. Among the groundless conten-

tions of some of the respondents, made in the testimony, but not distinctly raised by the pleadings, is that they simply signed a piece of paper with no form of contract attached thereto, and that it was a mere subscription paper. This is wholly incredible. In the first place, it is apparent that the solicitor, Blanchard, is correct in his testimony that the papers were a unit,—the two forms and the subscription were attached together. Aside from this, many of these respondents testify that when they signed the paper they saw the contract thereto, and over half allege in their answer that they examined its contents, and signed it after Blanchard had stated to them that they would only be held to the extent of their subscription. And what is still more glaringly contradictory is the fact that some of these parties, while testifying that no form of contract was attached, at the same time attempt the defense in their testimony that when they attached their names to the contract it was only signed "Davis and Rankin, The First Party, per Chas. Blanchard, Special Agent," and that Blanchard afterwards added, opposite the words "Davis and Rankin," the words "Bldg. & Manfng. Co." The paper shows on its face that the name "Davis and Rankin" was affixed at the bottom of the contract; so it was impossible for the parties to have seen that signature without seeing that it was attached to a contract. If they gave no heed to what they were signing, with the paper before their eyes, they must realize the force and virtue of the maxim of the law, "Vigilantibus et non dormentibus jura subveniunt." But suppose, as a matter of fact, that Blanchard did add the words "Bldg. & Manfng. Co." after "Davis and Rankin"; how does that affect the obligation? With conspicuous capitals, the contract, on its face, over and over again shows that the "Davis and Rankin Building and Manufacturing Company" is the party of the first part, with whom the subscribers, as "party of the second part," were contracting. The agent, if he neglected to add the full corporate name in signing the contract, could do that at any time before it was delivered, for it was not completely executed by the company until duly signed by the agent. About the time of the completion of the subscription list, mutterings of discontent, fomented mainly by the respondent Dix, arose among the subscribers, and some of them wrote to Blanchard to be released. Dix and Creedon wrote letters to the company manifesting dissatisfaction in a general way, whereat Mr. Woodbury, secretary of the company, was sent out from Chicago to Jefferson City to investigate the causes of discontent, and, if possible, to harmoniously adjust matters. On his arrival at Jefferson City he met subscribers in convention at the Monroe House, and saw others afterwards in detail, and particularly those interposing this plea of non est factum, when the whole grounds of grievance were canvassed and discussed. Not one of these respondents, in any letter ever written by them, or at any meeting, or in private conversation with Woodbury, suggested one word about the alleged alteration made in the contract as a reason for their unwillingness to proceed. Their whole ground of complaint, both in said letters and interviews, was predicated of other matters. They also made suggestions of compromise.

The contract contained the following provisions:

"The parties of the second part hereby agree to select and furnish suitable lands for said building, together with well, spring, or reservoir on said lot for the use of the business; and it is further understood that, in case the said second party shall fail to furnish said land and water within ten days after the execution of this contract, then the Davis and Rankin Building and Manufacturing Company, at its option, may select and furnish land and water in behalf and at the expense of the subscribers."

As the respondents had not made the selection nor offered the ground, Woodbury informed them at that interview that as the company, under the contract, could not compel payment without performance on its part, he would proceed, under the right conferred by the contract, to select and purchase the ground and furnish the water for the plant, and complete the works. More than that, he gave them notice in writing, which recited the contract in question by reference, and the provision just above quoted, advising them that he would proceed to acquire the land, etc. He proceeded thereafter in execution of the contract, bought and paid for the land, and put up and completed the creamery. Not one of the respondents at said meeting, or in said interviews, or in response to said notice, gave Woodbury or the company a word of warning about the alleged alteration in the contract, but, placing their complaints on other grounds, they stood by and suffered the company, in ignorance of the imputation that Blanchard had altered the contract before he returned it to the company, to go ahead with the manufacture of the material and machinery in their house at Chicago, and put it up on the ground at Jefferson City in view of the respondents. Shall they now be heard, in the forum of conscience, to interpose the alleged alteration against the demand of the company for its pay? It is a wholesome, because a reasonable and just, maxim of law, especially applicable in the administration of equity jurisprudence, that "he who did not speak when he should have spoken shall not be heard now that he should be silent." State v. Potter, 63 Mo. 226; Quinlan v. Keiser, 66 Mo. 605. This equitable rule has been succinctly stated by the supreme court of this state in Chouteau v. Goddin, 39 Mo. 229, as follows:

"When a party, by his acts or words, causes another to believe in the existence of a certain state of things, and induces him to act on that belief so as to alter his own previous condition, he will be concluded from averring anything to the contrary against the party so altering his condition."

And the supreme court of the United States, in Bank v. Morgan, 117 U. S. 108, 6 Sup. Ct. 657, citing with approval the language of Folger, J., in Continental Nat. Bank v. National Bank of Com., 50 N. Y. 583, held it not to be—

"always necessary to such an estoppel that there should be an intention, on the part of the person making a declaration or doing an act, to mislead the one who is induced to rely upon it. Indeed, it would limit the rule much within the reason of it if it were restricted to cases where there was an element of fraudulent purpose. In very many of the cases in which the rule has been applied, there was no more than negligence on the part of him who was estopped."

This case further maintains the proposition that if, in the transaction in dispute, the one party has led the other into a belief of a

certain state of facts, he cannot be heard afterwards, as against the first, to show that the state of facts did not exist. And, following this principle to its logical result, it has become axiomatic that "silence, when it is the duty of the party to speak, is equivalent to concealment." 7 Am. & Eng. Enc. Law, p. 12. So, it is held by the supreme court of Wisconsin, in Meincke v. Falk, 61 Wis. 623, 21 N. W. 785, that one who refuses to carry out a contract on the ground that it is illegal is estopped from afterwards raising the objection that the other party has not complied; and the reverse of the statement would be true,—that one who refuses to carry out a contract on the ground of specified misrepresentation would be estopped from afterwards raising the objection that the contract had been altered. It was but following up this sound rule of commercial honesty that the supreme court, in Railway Co. v. McCarthy, 96 U. S. 258, held that:

"When a party gives a reason for his conduct and decision touching anything involved in a controversy, he is estopped, after litigation has begun, from changing his ground, and putting his conduct upon another and different consideration."

Applying this rule to the facts of this case, the respondents who set up this plea of *non est factum* are estopped; and of consequence the second class of respondents, who ask to be discharged on the ground that those of the first class are released by reason of the alteration, are also estopped. Take, as an illustration, the conduct and attitude of the respondent Dix, who has been the leader in this resistance. In his letter of April 1, 1892, written long after he had signed the contract, he notified the company that he would not be responsible for the five shares of the subscription for the erection of the creamery, "for the reason that my name to said subscription, and amount subscribed, was obtained from me by false and fraudulent representations by the said Chas. Blanchard, who represented that he was the agent of the firm of Davis & Rankin, of Chicago." He specified wherein the alleged misrepresentation was false, to wit, that Blanchard represented himself as the agent of Davis & Rankin. He does not, even in his answer, allege this flimsy excuse as a defense. These respondents having placed their refusal to proceed on other grounds, and standing mute as to any claimed interpolation in the contract, the company had, in effect, their assurance that it might proceed in construction of the plant, subject only to loss in case any of the objections then interposed by them, and afterwards pleaded, should prove to be true in fact and valid in law. This is clear equity, as it is natural justice.

It then only remains to be seen what other defenses any of these respondents have set up than the one just disposed of. First, it is pleaded that the complainant cannot maintain this suit because it is a foreign corporation, and had failed to comply with the act of the legislature of Missouri approved April 21, 1891 (Laws Mo. 1891, p. 75). This act, in effect, requires every nonresident corporation for pecuniary profit, before it shall be authorized to transact or do any business in this state, to maintain a public office or place in the state for

the transaction of its business, where legal service may be obtained upon it, and where proper books shall be kept to enable such corporation to comply with the law governing such corporations, and subject to all the liabilities, restrictions, and duties imposed upon corporations of like character organized under the laws of the state, and forbidding it from mortgaging, pledging, or otherwise incumbering its real or personal property situated in this state, also requiring such nonresident corporation to file with the secretary of state a copy of its charter or articles of incorporation; and that the principal officer or agent in Missouri shall furnish the secretary of state a sworn statement of the proportion of the capital stock of said corporation represented by its property located, and business transacted, in this state. The act subjects such corporation, for a failure to comply therewith, to a fine of not less than $1,000, and in addition thereto denies to such corporation the right to maintain any suit or action in any court of the state upon any demand, whether arising out of a contract or tort, but with the proviso that the act shall not apply to "drummers," or traveling salesmen, soliciting business in the state for foreign corporations which are entirely nonresident. Independent of any consideration of whether or not this statute is violative of the interstate clause of the federal constitution, it is quite apparent, from a consideration of all of its provisions, that it was intended to apply only to such nonresident corporations as were conducting their business operations in the state in such manner as to give it a status here. It must be doing and conducting a business here, as it would be said of a resident citizen or corporation doing business in the community. The only evidence pertaining to the manner of making this contract and the conducting of complainant's business is the testimony of Mr. Woodbury, secretary of the company, who testified:

"We manufacture everything that pertains to the plant, and this is done in Chicago, and by ourselves. The contract for the building is done by agents who canvass the territory for us, under blank contracts furnished them. After this contract appears to them to be satisfactory, it is forwarded to us for ratification or rejection. If accepted by us, the agents are paid for the work, and their connection with it ceases. The machinery is made here in Chicago. We sell that to the contracting parties, and to other established creameries in the country."

Confessedly, the state legislature cannot deny to a nonresident citizen the right to send a canvassing agent here to solicit, by sample or otherwise, contracts for the sale of goods or machinery to be manufactured without the state, and shipped into and delivered in the state by the merchant or manufacturer. A corporation stands upon the same footing in this respect as an individual. Paul v. Virginia, 8 Wall. 168. Similar statutes in other states have been held ineffectual to prevent the operation, or to obstruct the contracts, of foreign corporations whose method is to send a solicitor into other states to make contracts for goods to be manfactured at the domicile of the corporation, and shipped to and delivered to the customer in the state, for the reason that such transactions are parts and promotive of interstate commerce, and not subject to state regulation. Gunn v. Machine Co. (Ark.) 20 S. W. 591; Bateman v. Milling Co.

(Tex. Civ. App.) Id. 931; Lyons-Thomas Hardware Co. v. Reading Hardware Co. (Tex. Civ. App.) 21 S. W. 300. If this act of the state legislature applies to this case, it would also apply to the instance of a manufacturer of mowers and reapers, like that of McCormick, who should send a traveling salesman into Missouri, soliciting from a farmer a contract for the sale of a reaper, to be manufactured at Chicago, and delivered at the farm in Missouri, with the usual stipulation that the company's agent should put it together and start it in running order. So of a manufacturer of furnaces for houses, who should send a soliciting agent into the state to make a contract with the owner of a building for a furnace, to be manufactured at the company's shops outside of the state, and by it shipped into the state, accompanied by an agent who was to put it up in working order. Carried to its logical conclusion, the state legislature could reach the case of every nonresident incorporated mercantile concern which manufactures and sells its wares through the medium of a traveling agent, who takes orders in this state for goods to be manufactured in another, of a particular character, and shipped into the state, and delivered by an agent of the shipper to the local merchant, under a stipulation that the agent should remain a few days and assist the purchaser in properly arranging the goods, and explaining to him their quality and the like. While according to the state the fullest recognition of its power to exclude from its territory every nonresident corporation from obtaining a footing—a situs—within its territory to transact business, the federal constitution interposes an insuperable barrier to its interference with the necessary operations of interstate commerce.

The next defense set up in the answer is that notwithstanding the clause in the contract which declares that the company will not be responsible "for any pledges or promises made by its agents or representatives that do not appear in this contract, and made a part thereof either in print or in writing," yet the agent, Blanchard, assured them that they would not be held on their subscription for a greater sum than the amount representing the shares subscribed for, and that the company promised in writing to make good any assurances of said Blanchard. The contract, on its face, is clear and explicit, and by its terms it is a joint and several contract, each subscriber being responsible for the whole sum of the contract price. Davis v. Shafer, supra. Waiving any discussion of the fact that the proof, even on the part of the respondents, shows that any such statement by Blanchard was made to only a few of them, it is to be kept in mind that it is not averred in the answer that this alleged statement by Blanchard was fraudulently and deceitfully made, or that respondents executed the contract in reliance upon the truth of such representations. The case presented, therefore, by the respondents, is a naked attempt to vary, change, and control the plain provisions of a written contract, by contemporaneous verbal statements and understanding. This precise question was decided adversely to this contention by this court in Davis v. Shafer, supra; and so say all the authorities. But, say respondents, the complainant afterwards promised in writing to make good any promise made by Blanchard.

Even conceding that a post promise by the complainant could be availed of by respondents, its extent would be defined and limited by the written promise. It could be no broader in its obligation than the expression. The basis for this allegation is predicated of three letters written to three of the respondents by the company after the contract was executed by the parties and delivered to the company. The promise, therefore, could only avail the three respondents, to wit, Clark, Creedon, and Davis. It does not appear affirmatively that any one except Creedon wrote to the company. In his letter he made no specification of any representations made him by Blanchard, but only stated, in general terms, that a number of the subscribers were dissatisfied, and that Blanchard was not a good man, and begged to be let off, "as I have other business to look after." In reply to this, the company wrote him as follows:

"Your favor of Apr. 5th received, and contents carefully noted. We are very sorry that any misunderstanding has arisen among your people, and we assure you that we will fulfill all promises made by our agent Chas. Blanchard; and, as he has full charge of this matter, we must refer you to him in reference to the request you make in your communication."

As to Clark and Davis it seems that their complaints were not made in letters to the company, but that they had complained to Blanchard; and to each of them the company wrote as follows:

"We are informed through our agent Mr. Chas. Blanchard that there is some misunderstanding and trouble brought on by one L. V. Dix. We are sorry that any misunderstanding should arise, and we assure you that we will fulfill all promises made by Mr. Chas. Blanchard, and will do all in our power to make your creamery a success."

The promise is to be understood as having been employed by the writer in its ordinary legal significance or common acceptation, which Black, in his Law Dictionary, defines to be:

"A declaration, verbal or written, made by one person to another, for a good or valuable consideration, in the nature of a covenant, by which the promisor binds himself to do or forbear some act and gives to the promisee a legal right to demand and enforce a fulfillment."

That is to say, if Blanchard had made such a declaration, based on a good or valuable consideration, to do for respondents some future act, the company would carry it out. No reasonable conclusion can arise, from the language of these letters, that it had any possible reference to the present claim of respondents that Blanchard had made them assurances that the plain terms of their written promise to pay should not be complied with, but rather, that if Blanchard had made them some independent promise respecting something to be done by him for them outside of the terms of the written compact, based, of course, upon a consideration, the company would keep and perform it. But even a written promise made by the company, after the execution and delivery of the contract, without some new consideration therefor, would be a mere nudum pactum; and especially so where, as in this case, the respondents had thereafter done no act in reliance thereon, so as to alter their previous condition. Davis v. Shafer, 50 Fed. 772.

The only other defense interposed by the answer is that no deed

to the property has ever been tendered; that the title was bad; the creamery was not completed in time, and did not come up to the requirements of the contract. It is sufficient to say there is no evidence to support this contention. The respondent Dix claims, in his testimony, that he had a contract with Blanchard by which it seems Blanchard promised to allow him $300 for his services in assisting him to obtain subscribers to the contract. It is enough to say of this that Dix sets up no such matter in his answer, but contents himself simply with the plea of non est factum. He was necessarily, in his pleading, driven to this attitude, because it would hardly be consistent with his claim that the contract had been varied and was fraudulent, while he himself was going around with Blanchard persuading others to sign it. It results that the issues are found for the complainant. Decree accordingly.